**HOUSING WORKS, INC.,** Bruno Alicia, James Arnold, Paul Alston, Douglas Cho–Hill, Reyes Cruz, Patrick D. Dolby, Dexter C. Duskin, Earl C. Ellis, Yvette Gregory, Barry Harris, Iesha Jackson, Donile Knight, Takeasha Newton, Laverne Patent, Tatia Smith, Velisa Green Summerlin, Jan Thurman, Robert Tolbert, Roberto Valderrama, Plaintiffs,

v.

Jason **TURNER**, Human Resources Administration (HRA) Administrator/Department of Social Services Commissioner, Mark Hoover, First Deputy Commissioner of HRA, and the City of New York, Defendants.

Housing Works, Inc., Plaintiff,

v.

Rudolph Giuliani, Mayor, City of New York; Randy Mastro, Deputy Mayor, City of New York; Fran Reiter, Deputy Mayor, City of New York; Elizabeth Kaswan, Chief Procurement Officer, City of New York; Lou–Ellen Barkan, Chief of Staff to Deputy Mayor Randy Mastro; Lilliam Barrios–Paoli, Human Resources Administration (HRA) Commissioner; Jason Turner, HRA Commissioner; Gregory Caldwell, HRA Deputy Commissioner, Division of Aids Services and Income Support (Dasis); John A. Dereszewski, Dasis Director of Contract Services; Richard Bonamarte, HRA Agency Chief Contracting Officer; Jack McKay, HRA General Counsel; Neal L. Cohen, Department of Health

(DOH) Commissioner; Mitchell Netburn, DOH Agency Chief Contracting Officer; James Capoziello, DOH Acting Agency Chief Contracting Officer; the City of New York; and Jack Hiralall, P.C., Defendants.

Nos. 00 Civ. 1122(VM),
00 Civ. 3561(VM).

United States District Court,
S.D. New York.

Nov. 29, 2001.

Matthew D. Brinckerhoff, David H. Gans, Emery, Cuti, Brinckerhoff & Abady, P.C., New York City, for Housing Works, Inc., Bruno Alicia, James Arnold, Paul Alston, Douglas Cho–Hill, Reyes Cruz, Patrick D. Dolby, Dexter C. Duskin, Earl C. Ellis, Yvette Gregory, Barry Harris, Iesha Jackson, Donile Knight, Takeasha Newton, Laverne Patent, Tatia Smith, Velisa Green Summerlin, Jan Thurman, Robert Tolbert and Roberto Valderrama.

Bob Bailey, Michael D. Hess, Corp. Counsel of City of NY, New York City, for City of New York, Rudolph Guiliani, Fran Reiter, Lilliam Barrios–Paoli, Jason Turner, Mark Hoover, Gregory Caldwell, John A. Dereszewski, Richard Bonamarte, Neal L. Cohen, Mitchell Netburn and James Capoziello.

Nadine Rivellese, NYC Law Dept., New York City, for Randy Mastro, Elizabeth Kaswan and Lou–Ellen Barkan.

### DECISION AND ORDER

MARRERO, District Judge.

*TABLE OF CONTENTS*

I. *STANDARD OF REVIEW* ................................................. 182

II. *FACTS AND PROCEDURAL HISTORY* ....................................... 183

 A. THE PARTIES .................................................. 183

 B. THE RELATIONSHIP BETWEEN THE PARTIES ...................... 185

 1. The Scattered Site and Ryan White Enhancement Contracts ............. 185

 2. The DOH Intake Contract ......................................... 186

 3. Housing Works's History of Financial Mismanagement .................. 186

 C. HOUSING WORKS'S CONSTITUTIONALLY PROTECTED
 ACTIVITIES ...................................................... 187

 D. THE ALLEGATIONS OF RETALIATION ............................... 188

 1. The City's Refusal to Renew the Scattered Site and Ryan White
 Contracts ..................................................... 188

 2. The Refusal to Recognize the DOH Intake Contract ................... 189

 E. THE ALLEGATIONS OF CONTINUING RETALIATION ............... 190

 1. HRA's New Scattered Site Contract ................................ 190

 2. Additional Funds under the Ryan White Care Act .................... 191

 3. The 9th Street and East New York Residences ....................... 191

 4. Housing Works's Job Training Program and the New York State
 Welfare–to–Work Initiative ...................................... 191

 5. Non–Responsibility Findings ...................................... 192

 F. HOUSING WORKS'S CLAIMS ...................................... 192

III. *DISCUSSION* ......................................................... 193

 A. RETALIATION FOR PROTECTED FIRST AMENDMENT
 ACTIVITY ....................................................... 193

 B. EQUAL PROTECTION ............................................ 199

 C. QUALIFIED IMMUNITY, DIRECT PARTICIPATION AND THE
 APPLICABILITY OF THE STATUTE OF LIMITATIONS AS TO
 REITER ........................................................ 201

 1. Qualified Immunity .............................................. 201

 2. Direct Participation .............................................. 202

 a. Giuliani ...................................................... 203

b. Turner ............................................................ 203

c. Netburn .......................................................... 204

d. Hoover ........................................................... 204

3. Applicability of the Statute of Limitations to the Claims Against
 Reiter ........................................................... 205

D. CLAIMS FOR DAMAGES AGAINST THE CITY ......................... 205

1. Damages Against the City for Violations of the New York State
 Constitution .................................................... 205

2. Punitive Damages against the City and the Individual Defendants ........ 209

E. FRAUD AND MISREPRESENTATION ................................ 209

F. UNJUST ENRICHMENT AND QUANTUM MERUIT ................... 213

G. ACCOUNTANT MALPRACTICE .................................... 214

H. HOUSING WORKS'S FIFTH AND SIXTH CLAIMS .................... 221

IV. *ORDER* ........................................................ 221

\* \* \* \* \* \*

Plaintiff Housing Works, Inc., together with nineteen of its client-members (hereinafter collectively referred to as "Housing Works"), is, by its own admission, a vociferous and opinionated community-based, not-for-profit corporation, advocating on behalf of persons living with HIV and AIDS, many of whom are often homeless and drug-dependent. Housing Works initiated these actions against the City of New York (hereinafter the "City") and several high-ranking municipal officials, including the Mayor, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 1983 for alleged violations of the First and Fourteenth Amendments to the United States Constitution. Housing Works also brought a number of claims under New York State and City law. Defendants have moved under Rule 12(c) of the Federal Rules of Civil Procedure to dismiss all claims. Because Housing Works has alleged facts sufficient to support its federal and state constitutional claims and because the present controversy raises a legal issue of first impression in this Circuit, the motions are granted in part and denied in part.

## I. STANDARD OF REVIEW

When a party, after the filing of an answer, moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on the grounds of failure to state a claim, the court may employ the same standards applicable to a motion brought pursuant to Rule 12(b)(6). *Nat'l Ass'n of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories,* 850 F.2d 904, 910 n. 2 (2d Cir. 1988); *see also Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994).

Therefore, in the context of the present motion, the Court accepts the well-pleaded assertions of fact in the complaint as true and draws all reasonable inferences and resolves doubts in favor of the non-moving party. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995) (citations omitted). The focus of the Court's

inquiry is not whether plaintiffs will ultimately prevail, but whether the claimants are entitled to an opportunity to offer evidence in support of their claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Therefore, a motion to dismiss under either Rules 12(c) or 12(b)(6) for failure to state a claim will be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## II. *FACTS AND PROCEDURAL HISTORY*

The present action, spanning a relevant time period of ten years, names as defendants the City and sixteen municipal employees or agents. The long and complex history of the case requires a thorough recitation for purposes of this motion. Accepting, as it must, the well-pleaded allegations in the complaint as true, the Court acknowledges the following factual assertions as set forth in the pleadings.[1]

### A. *THE PARTIES*

Housing Works is a leading not-for-profit organization which administers programs dedicated to serving persons living with HIV/AIDS. Its mission is to provide critical housing and support services to its clients. Housing Works claims to be unique among its peers in that it focuses on assisting persons with the most pressing problems, often so severe that other organizations regularly turn them away. Housing Works's clients are often homeless, "desperately ill, often emotionally troubled, chemically dependent, financially crippled, and socially disgraced."[2]

The organization's mission has a simple philosophical underpinning—supportive housing coupled with critical support services is the best prescription for fostering independent, self-sustaining lifestyles and a return to productive activities among its clients. According to Housing Works, this prescription has achieved notable success. Prior to the events leading up to this action, Housing Works purports to have served more than 10,000 homeless persons living with AIDS, many of whom lived, and continue to live, productive and independent lives.[3]

Housing Works also seeks to provide a comprehensive range of services. In addition to its core housing mission, it offers case management services, substance abuse and mental health counseling, client legal services, medical monitoring, job training, and a theater project.

---

1. The present case began as two separate actions in District Court: *Housing Works, Inc. v. Turner*, No. 00 Civ. 1122 (S.D.N.Y. Feb. 15, 2000) (hereinafter the "Turner Complaint") and *Housing Works, Inc. v. Giuliani*, No. 00 Civ. 3561 (S.D.N.Y. May 10, 2000) (hereinafter the "Giuliani Complaint"). In substance, the two complaints overlap on one core set of facts with respect to retaliation for exercise of protected First Amendment activity, and the federal and state constitutional claims are identical in both. On this basis, the Court accepted the action corresponding to the Giuliani Complaint as related to its predecessor. The opposition and reply briefs on the Rule 12(c) motion were consolidated to encompass both actions, and the Court addresses the claims in both complaints in this Decision and Order. Jack Hiralall, P.C. moves separately for dismissal of the ninth claim in the Giuliani Complaint, alleging accountant malpractice.

 When appropriate, the Turner and Giuliani Complaints are collectively referred to as the "Complaints."

2. Giuliani Complaint, at ¶ 1.

3. *Id.* at ¶¶ 30, 34–36.

Defendants include the City and sixteen municipal employees or agents, acting in their individual, and in some cases their official, capacities. The Complaints also identify several municipal agencies with which those individuals are associated.

The Giuliani Complaint names Mayor Rudolph W. Giuliani (hereinafter "Giuliani") as its primary defendant. Housing Works claims that Giuliani was the principal policy-maker with respect to all of the municipal agencies relevant to the action. Along with Giuliani, the complaint alleges that his deputies Randy Mastro (hereinafter "Mastro"), Fran Reiter (hereinafter "Reiter") and Reiter's Chief of Staff Lou-Ellen Barkan ("Barkan") were also involved in the alleged wrongdoing as policy-makers acting in their individual and official capacities. In addition, the Giuliani Complaint names as a defendant the City Chief Procurement Officer, Elizabeth Kaswan (hereinafter "Kaswan"), in her role as policy-maker with respect to the Mayor's Office of Contracts (hereinafter "MOC").[4]

One of the principal municipal agencies at issue in this case is the New York City Human Resources Administration (hereinafter "HRA"), which includes the New York City Department of Social Services. According to the Complaints, HRA had primary responsibility for administering several housing programs and for certifications relating to various federal, state and municipal projects, as well as municipal benefits. Housing Works named two Commissioners of HRA as defendants: Lilliam Barrios–Paoli (hereinafter "Barrios–Paoli"), whose tenure ended some time in 1997 and Jason Turner (hereinafter "Turner"), who presumably succeeded Barrios–Paoli. In addition to the two Commissioners, the Complaints name as defendants the following HRA officials: Richard Bonamarte (hereinafter "Bonamarte"), Agency Chief Contracting Officer of HRA; Jack McKay (hereinafter "McKay"), Acting General Counsel of HRA; Gregory Caldwell (hereinafter "Caldwell"), Deputy Commissioner of HRA in charge of the Division of AIDS Services and Income Support (hereinafter "DASIS"); John Dereszewski (hereinafter "Dereszewski"), Director of Contract Services for DASIS; and Mark Hoover (hereinafter "Hoover"), First Deputy Commissioner of HRA.[5]

The Giuliani Complaint also identifies officials of the New York City Department of Health (hereinafter "DOH") as defendants. DOH is the municipal agency charged with setting the public health agenda for the City and with implementing effective public health strategies. In dispute here, however, is DOH's role in administering certain agreements with independent contractors, such as Housing Works, to provide initial assessment and case management services to the public. The Giuliani Complaint also names Neal Cohen (hereinafter "Cohen"), Commissioner of DOH; Mitchell Netburn (hereinafter "Netburn"), Agency Chief Contracting Officer for DOH; and James Capoziello ("Capoziello"), Acting Agency Chief Contracting Officer for DOH.[6]

Finally, the Giuliani Complaint asserts a claim against Jack Hiralall, P.C. (hereinaf-

---

**4.** When appropriate, the City, Giuliani, Mastro, Reiter, Kaswan and Barkan are referred to collectively as the "Mayoral Defendants."

**5.** Hoover is a named defendant only in the Turner Complaint. All other individual defendants are named in the Giuliani Complaint. When appropriate, the City, Barrios– Paoli, Turner, Caldwell, Dereszewski, Bonamarte, McKay and Hoover are referred to collectively as the "HRA Defendants."

**6.** When appropriate, the City, Cohen, Netburn and Capoziello are referred to collectively as the "DOH Defendants."

ter "Hiralall"), a professional business organization engaged in providing accounting services and retained by the City to perform an audit of Housing Works's financial records.[7]

## B. THE RELATIONSHIP BETWEEN THE PARTIES

Since its inception in 1991, Housing Works and the City have had a relationship characterized by fragile, oftentimes divisive, programmatic mutual dependence and support. Specifically, Housing Works has operated four programs that it alleges were adversely affected by the City's retaliatory actions: (1) the Intake Program, which seeks to provide initial assessment, case management and crisis intervention for people living with HIV/AIDS who are homeless or threatened with homelessness; (2) the Residential Housing Program, which attempts to secure residential leases for persons living with HIV/AIDS in scattered sites throughout the New York metropolitan area; (3) the Residential Facilities Program, which provides apartment housing in two buildings owned by Housing Works; and (4) the Second Life Job Training Program (hereinafter "JTP") which provides Housing Works clients with a work/study program culminating in full-time employment and related benefits, within the Housing Works organization.[8] Through its leasing and purchasing activities, Housing Works held leases on over two hundred residential apartment units and owned outright an additional sixty-eight units as of October 1997.[9]

Housing Works depended on the City, as well as the state and federal governments, for a substantial portion of its funding. Conversely, the City outsourced a number of critical administrative and operational functions to Housing Works. Housing Works was often at the front line making initial case assessments, securing housing and then providing a range of services to persons living with HIV/AIDS. Stated another way, by virtue of its programs, Housing Works had a "vendor" relationship with the City in which Housing Works would provide housing and support services in return for reimbursement from public funds at a later date.[10]

The relationship between the parties was not merely an ad hoc arrangement calling for occasional reimbursements when proof of services provided was submitted. According to Housing Works, the parties had a long-term contractual relationship reflected in at least three separate agreements.

### 1. The Scattered Site and Ryan White Enhancement Contracts

In 1992, Housing Works and the City, through HRA, entered into a written agreement (hereinafter the "Scattered Site Contract") to provide housing for people living with AIDS. Pursuant to the Scattered Site Contract, Housing Works provided private residential housing and supportive services to persons living with AIDS and their families referred to Housing Works by HRA. To meet its obligations under the Scattered Site Contract, Housing Works would advance rents to private landlords and absorb the initial costs of supportive services. The parties contemplated that the City would later reimburse Housing Works for those costs.

---

7. All defendants combined, with the exception of Hiralall, are collectively referred to as the "City," or the "City Defendants."

8. Giuliani Complaint, at ¶ 38.

9. *Id.* at ¶ 60.

10. *Id.* at ¶ 57.

The initial term of the Scattered Site Contract lasted for three years, and it appears from the record that the agreement was extended to on or about June 30, 1997. When it was entered into, the Scattered Site Contract had an annual value of close to $1 million and covered approximately forty households. Through various amendments and extensions, the value of the Contract increased to $4.3 million, covering two hundred households.

To meet its obligations under the Scattered Site Contract, Housing Works held 180 residential apartment leases to accommodate the referrals from HRA. These apartments were scattered throughout Manhattan, Brooklyn, Queens and the Bronx. In administering the Scattered Site program, Housing Works also leased commercial real estate in the Bronx for its administrative offices under a ten-year agreement.

Apart from the Scattered Site Contract, Housing Works also received a supplement from federal funds made available by DOH. The supplement was disbursed to Housing Works through HRA by operation of a separate agreement, the Ryan White Enhancement Contract (hereinafter the "Ryan White Contract"). Pursuant to the Ryan White Contract, Housing Works provided supplemental social services to the participants of the Scattered Site program. The Ryan White Contract had an annual value of approximately $187,700.

### 2. The DOH Intake Contract

In June 1997, Housing Works and the DOH completed negotiations on a three-year agreement (hereinafter "DOH Intake Contract"), contemplating the provision of general intake, assessment and referral services by Housing Works to persons living with AIDS. In return for providing these services, the City, through DOH, would later reimburse Housing Works.

Although Housing Works began performing intake services on July 1, 1997, the DOH Intake Contract was not formally executed until August 18, 1997, and it is unclear whether the DOH Intake Contract was never properly registered by the City Comptroller's Office as required by law or simply terminated.

The DOH Intake Contract had an annual value of $150,000, and Housing Works contends that it continued to provide services under the agreement for six to nine months without receiving any reimbursement.

### 3. Housing Works's History of Financial Mismanagement

From its inception in 1991, Housing Works grew at a fast clip. The increase in the number of persons and households covered under housing and support contracts described above clearly attest to that fact. As often occurs in periods of rapid growth, the systems that Housing Works first implemented became inadequate as the magnitude of certain tasks expanded. By late 1995, Housing Works concedes that its accounting systems could no longer adequately track its fiscal situation. The organization became entangled in a financial crisis, severely affecting cash flow and impeding its ability pay its creditors and employees.

According to Housing Works, it informed HRA of the looming financial crisis as soon as the situation was discovered. Consultations with HRA led to the hiring of professional accounting firms for the purpose of developing and implementing a corrective action plan. These consultations with HRA and the accountants took place during the Spring and Summer of 1996.

During that same time period, the New York City Department of Investigations

(hereinafter "DOI") conducted a review of Housing Works's financial records. In July 1996, DOI issued a memorandum which confirmed that as of late 1995, Housing Works's accounting practices were inadequate. In addition, the DOI memorandum recommended that HRA conduct an audit of Housing Works's Scattered Site Contract.

For the better part of 1996, HRA closely monitored Housing Works's finances and the ongoing implementation of the corrective plan. By December 1996, Housing Works contends that it had fully implemented the corrective measures and that HRA expressed its satisfaction that proper measures had been put into place. According to Housing Works, HRA's satisfaction was formally memorialized in an internal memorandum in which Dereszewski indicated that Housing Works had successfully implemented a nine-point corrective action plan. Subsequently, in August 1997, Housing Works asserts that HRA provided MOC with a memorandum making an affirmative finding of Housing Works's responsibility as a contractor.

Therefore, although Housing Works concedes that it had financial management problems in the past, it underscores that those problems ended as of December 1996, when it successfully implemented the corrective action plan and received formal recognition of the corrective measures.

## C. *HOUSING WORKS'S CONSTITU-TIONALLY PROTECTED ACTIVI-TIES*

Although the City, its various social services agencies and Housing Works were enmeshed in several mutually dependent and supportive contractual arrangements, the Court has already noted that these relationships were marred by divisiveness. According to Housing Works, this aspect of the parties' relationships was attributable to Housing Works's vigorous advocacy on behalf of persons living with AIDS. In keeping with its vision of a broad-spectrum organization dedicated to enhancing the lives of those afflicted with HIV/AIDS, Housing Works not only arranged for housing and provided critical support services, it also argued vigorously in various fora on behalf of persons living with HIV/AIDS.

As alleged in the Giuliani Complaint, "Housing Works has long been a vocal and militant critic of the Giuliani Administration's attempts to cut and restrict essential services and benefits provided for low-income people with HIV and AIDS." [11] The group staged a number of protests against the Mayor and the municipal agencies responsible for social services. In one of the more dramatic exploits, Housing Works members participated in a "coalition demonstration," which attempted to block rush hour traffic at local bridges and tunnels.[12] In another, eleven people were arrested during a Housing Works protest for chaining themselves to desks at the Mayor's campaign headquarters.[13] The Complaints also detail an almost routine participation by Housing Works in annual demonstrations, such as World AIDS Day, disruptions at HIV policy planning meetings and instances of civil disobedience in front of City Hall.

In addition, Housing Works was an active litigant, most often targeting the City, its agencies and its employees, some of them named defendants in this case. The litigation initiated by Housing Works included: *Housing Works, Inc. v. City of*

---

**11.** *Id.* at ¶ 41.

**12.** *Id.* at ¶ 43.

**13.** *Id.*

*New York,* No. 99 Civ. 8975 (S.D.N.Y. Aug. 17, 1999) (seeking reversal of a City agency's ranking of Housing Works in an application for federal funding); *Housing Works, Inc. v. Safir,* No. 98 Civ. 4994, 1998 WL 409701 (S.D.N.Y. July 21, 1998) (challenging the City's limitation of the size of a Housing Works protest in front of City Hall); *Henrietta D. v. Giuliani,* No. 95 Civ. 0641, 1996 WL 633382 (E.D.N.Y. Oct. 25, 1996) (seeking preliminary injunction against the City and State to prevent them from implementing their allegedly ineffectual system of distributing benefits to City residents living with AIDS/HIV); and *Hernandez v. Barrios–Paoli,* 93 N.Y.2d 781, 698 N.Y.S.2d 590, 720 N.E.2d 866 (1999) (Article 78 proceeding challenging HRA's eligibility verification review for DASIS benefits).

There is no dispute between the parties that the activities described above are protected by the First Amendment and analogous provisions of the New York State Constitution.

### D. *THE ALLEGATIONS OF RETALIATION*

The crux of Housing Works's federal claims is that in response to its vocal criticism of the Giuliani Administration's HIV/AIDS policies, the City and the individual defendants retaliated against Housing Works by, *inter alia,* refusing to renew its contracts with the City and by preventing Housing Works from securing any future funding in connection with municipal, state and federal grants. The Complaints allege the following retaliatory measures.

#### 1. *The City's Refusal to Renew the Scattered Site and Ryan White Contracts*

In or about January 1997, Reiter advised Caldwell to conduct a subsequent audit of Housing Works's financial records relating to the Scattered Site Contract for the time period between July 1, 1994 and December 31, 1996. According to Housing Works, the time frame recommended was deliberately and narrowly tailored to capture the years corresponding to its financial crisis, and Reiter recommended the audit notwithstanding the approval by the relevant municipal agency, HRA, of Housing Works's corrective plan. For the purposes of this audit, Caldwell, acting through HRA, retained the firm of Jack Hiralall, P.C. to conduct the accounting.

In the subsequent months, Housing Works made repeated inquiries as to the status of the Scattered Site Contract, which was set to expire on June 30, 1997, and as to the prospects for renewal. According to Housing Works, Barrios–Paoli, Bonamarte, Dereszewski and other HRA Defendants falsely stated that the City was on the verge of extending the Scattered Site Contract. HRA Defendants made similar representations in connection with the Ryan White Contract which was set to expire on March 3, 1997. Housing Works alleges that these officials made specific statements causing it to believe that both of the Contracts would be renewed for an additional one-year term. These statements were allegedly made in order to induce Housing Works to continue to perform under both Contracts without reimbursement beyond their respective termination dates.

In addition, it appears that the City's outward conduct manifested an intention, at the very least, to renew the Contracts. In or about late June 1997, Caldwell and Dereszewski "approved" Housing Works's budget for an additional 12–month period.[14] On June 24, 1997, six days before the expiration of the Scattered Site Con-

14. *Id.* at ¶ 97.

tract, Dereszewski insisted that Housing Works duly execute and deliver all documents necessary to process the contract extension. As late as September 1997, the HRA Defendants allegedly continued to make false representations about the pending renewal, and, more importantly, HRA continued to refer persons living with AIDS to Housing Works for placement in the Scattered Site program, as if there were no interruption in the arrangement between the parties. With respect to the Ryan White Contract, HRA allegedly continued to monitor compliance with the agreement, requesting the submission of status reports and billings.

Throughout this period of uncertainty, Housing Works continued to advance rent payments to landlords pursuant to the Scattered Site Contract and to provide supplemental services to Scattered Site clients pursuant to the Ryan White Contract. Beginning in August 1997, the City refused to reimburse Housing Works for the services that it continued to provide. On October 16, 1997, Housing Works filed a notice of claim with the City Comptroller for past due amounts on services provided. By that point, the relationship between the parties had become strained to the point where Housing Works began planning a demonstration to protest the City's actions. The organization began distributing flyers announcing a demonstration to be held on October 22 at HRA's offices to protest the City's refusal to reimburse Housing Works for services provided since July 1, 1997.

Housing Works alleges that, as word began to leak, the City was plotting its response. The Mayor's Office, MOC and DOI communicated extensively with each other about the impending demonstration. According to Housing Works, "[d]uring the

days leading up to the October 22, 1997 demonstration (and thereafter), defendants Mastro, Barkan, Kaswan, and other representatives of the Mayor's Office and MOC methodically located each and every contract or potential contract involving Housing Works and proceeded to systematically stop them all from being consummated, registered, or in any way advanced." [15]

Apparently, Housing Works's protest went ahead as scheduled. Immediately following the demonstration, the HRA issued a press release which stated: "[b]ased on the latest audit report, which found over $500,000 in funds unaccounted for by Housing Works, HRA could not renew the Housing Works scattered site contract which expired on June 30, 1997 or enter into new contracts." [16] According to Housing Works, the allegations of financial mismanagement were a pretext for retaliation against it for its exercise of protected First Amendment rights.

### 2. The Refusal to Recognize the DOH Intake Contract

After having formally executed the DOH Intake Contract on August 18, 1997, Housing Works continued to perform its obligations under the agreement in subsequent months. According to Housing Works, on October 23, 1997, the day after the HRA press release and shortly after the filing of Housing Works's notice of claim, the Mayoral, MOC, and DOH Defendants arranged to have the DOH Intake Contract pulled from the Comptroller's Office before it could be registered.

Housing Works further alleges that one of its officers spoke with DOH Chief Contracting Officer Netburn on January 14, 1998. In that conversation, Netburn allegedly confirmed that the MOC had in fact

---

**15.** *Id.* at ¶ 121.

**16.** *Id.* at ¶ 123.

pulled the DOH Intake Contract and that it would not be registered until the subsequent investigation of Housing Works Scattered Site records, apparently still ongoing, was completed. In addition, Netburn revealed that Kaswan had informed him that no action of any kind would be permitted on a contract with Housing Works until the investigation was completed. Housing Works also claims that Netburn notified it that the City's "policy" was to refuse to do business with people who were involved in litigation with the City.[17]

### E. *THE ALLEGATIONS OF CONTINUING RETALIATION*

In addition to the City's allegedly unlawful refusal to renew the Scattered Site and Ryan White Contracts and to register the DOH Intake Contract, Housing Works claims that the City instituted a blanket policy against it, again in retaliation for its criticism of the City's AIDS policies, which prevented Housing Works from securing any additional contracts.

#### 1. *HRA's New Scattered Site Contract*

On October 6, 1997, HRA released a request for proposals (hereinafter "RFP") for a new scattered site program to commence July 1, 1998, covering 1,130 apartment units earmarked for persons living with AIDS. The RFP included some of the units previously administered by Housing Works in its Scattered Site program. Housing Works's units were put up for bids in three separate categories, which identified Housing Works as a current vendor. The rules of the RFP prohibited any one applicant to bid on more than one unit increment within a category.

Pursuant to the RFP, bidders identified as current vendors were given a distinct and measurable advantage over prospective bidders because all potential awardees were rated on a scale of 1–100, with 30 points allocated to the bidder's experience. The points in the experience category were much easier to obtain with the current vendor label.

On November 16, 1997, shortly after the demonstration and the HRA press release, Caldwell and Dereszewski amended the RFP, which had the effect, according to Housing Works, of making it impossible for it to recover the approximately 200 units that it once had under its administration. HRA achieved this effect by altering the categories and the unit increments available for bidding. Notwithstanding the amendment, Housing Works submitted a proposal under the terms of the initial RFP, admittedly hoping to obtain a judicial order requiring HRA to proceed under the framework of the original RFP.

In response, Caldwell wrote to Bonamarte recommending that Housing Works's proposal be rejected as unresponsive and unreviewable. Thereafter, Housing Works amended a state court complaint to add a cause of action for retaliation based on the amended RFP. A week later, HRA amended the RFP again.

The second amended RFP permitted Housing Works to bid on all its existing apartments, but it dramatically altered Housing Works's status from that of current vendor to non-incumbent bidder. The disadvantage was fatal. Housing Works alleges that even Dereszewski conceded that the revision to non-incumbent status made it "extremely difficult, extremely unlikely" that Housing Works would score the necessary points to bid successfully.[18]

---

**17.** *Id.* at ¶ 166.

**18.** *Id.* at ¶ 155.

In or about June 1998, Housing Works's proposal was rejected.

### 2. *Additional Funds under the Ryan White Care Act*

In 1997, the Medical Health Research Association of New York City, Inc. (hereinafter "MHRA"), a private contractor that administers funds made available pursuant to the Ryan White Care Act, issued an RFP for the provision of support services, including harm reduction and day treatment for persons living with AIDS. According to the Giuliani Complaint, Housing Works was the successful bidder on the MHRA Ryan White funds, which had an annual value of $450,000. Housing Works alleges that the subject of the MHRA Ryan White funds arose in the same conversation with Netburn described above. Like the DOH Intake Contract, the MHRA Ryan White Contract was subject to the City's policy that it would take no action on any contract with Housing Works until the completion of the Scattered Site investigation.

### 3. *The 9th Street and East New York Residences*

From 1992–97, Housing Works negotiated with federal, state and City officials for financial assistance in the opening and operation of two residences, located on 9th Street in Manhattan and in East New York, Brooklyn, dedicated exclusively to persons living with AIDS. According to the Giuliani Complaint, the parties agreed upon the final terms of the operating contracts sometime in June or July 1997. The conclusion of the negotiations was marked by a final agreement entered into between Housing Works and HRA in July 1997.

Thereafter, HRA repeatedly informed Housing Works that the operating contract for the residences was being processed. According to Housing Works, it was notified on October 22, 1997 that HRA would not enter into any new contracts with Housing Works, including the operating contract for the residences.

### 4. *Housing Works's Job Training Program and the New York State Welfare–to–Work Initiative*

As part of its broad service offerings, Housing Works also operates a "Second Life Job Training Program" (hereinafter "JTP").[19] The JTP provides a rigorous nine-month work/study program which concludes with the graduates' guaranteed employment in an administrative position within the Housing Works organization. The JTP boasts a 75 percent retention rate for graduates after one-year of employment. The JTP works in conjunction with DASIS to ensure that JTP participants receive the vocational, medical, clinical and supportive services and benefits they need.

On October 5, 1998, the New York State Department of Labor (hereinafter "NYSDOL") and the New York State Department of Health (hereinafter "NYSDOH") issued an RFP as part of their Welfare–to–Work Initiative, which provided funding for projects designed to promote job training for people living with HIV/AIDS. Funding under the Initiative was contemplated to begin on March 1, 1999, with awardees receiving $600,000 over two years. As a precondition for selection, applicants were required to obtain the written approval of the local services district, which for Housing Works was HRA.

On December 12, 1998, Housing Works submitted its application pursuant to the

**19.** The relevant facts of Housing Works's claims relating to the Welfare–to–Work application are set out in the Turner Complaint.

State RFP. Its application allegedly included a certification form signed by Turner, dated December 5, 1998, indicating that HRA had approved the application. In all other respects, the application satisfied all of the program's design components as specified in the RFP. According to Housing Works, the panel making preliminary evaluations of the application ranked Housing Works first out of ten applications.

Before the final awards were made, Housing Works contends, Turner wrote a letter to the Commissioner of NYSDOL on February 23, 1999, informing the Commissioner that the City was withdrawing its prior certification of Housing Works's application under the RFP. The correspondence stated as the grounds for the City's withdrawal of certification Housing Works's past financial management problems.

At the behest of NYSDOL and NYS-DOH, representatives of Housing Works, the relevant state agencies and Turner and Hoover convened for a special meeting. NYSDOL and NYSDOH officials asked Turner and Hoover to reconsider their withdrawal of the certification in order to accommodate the applicant ranked number one. Furthermore, NYSDOL and NYSDOH proposed a number of alternatives, under which Housing Works would receive funding under financial controls or through intermediaries to alleviate the concerns expressed by Turner and Hoover. According to Housing Works, Turner and Hoover rejected all of the proposed alternatives, stating simply that HRA refused to support any plan which would provide State funds to Housing Works. In addition, Turner threatened to punish Housing Works's JTP participants if any State funds were provided to Housing Works under the Welfare–to–Work Initiative. In or about August 1999, NYSDOL informed

Housing Works that its proposal had not been selected for the Welfare–to–Work funding.

According to Housing Works, HRA's retaliation did not stop there. In addition to withdrawing its certification for the State Welfare–to–Work Initiative, HRA also refused to certify Housing Works as an approved City job training provider. This separate certification from the City allows the participants of certified job training programs to receive transportation, child care and clothing allowances. Housing Works charges that HRA's refusal to approve Housing Works as a certified job training provider has deprived its individual clients from receiving those public assistance benefits.

### 5. *Non–Responsibility Findings*

On the basis of the January 1997 audit of Housing Works's Scattered Site program and the City's belief that Housing Works was indebted to it, two separate municipal agencies, HRA and DOH, made affirmative findings of Housing Works's non-responsibility as a contractor. Housing Works asserts that it filed administrative appeals through the relevant chain of command. Both of those affirmations were eventually appealed to Giuliani, who has not yet acted upon them. According to Housing Works, Giuliani's deliberate flouting of his obligations is not only grounds for a separate claim for relief, but also indicative of the retaliatory nature of the City's response to Housing Works's applications.

### F. *HOUSING WORKS'S CLAIMS*

On the basis of these allegations, Housing Works brought nine claims against the City and sixteen individual municipal officials involved in the matters now before

the Court.[20] The first claim, brought under 42 U.S.C. § 1983 (hereinafter "§ 1983" or "Title VII"), alleges a violation of Housing Works's right to free speech secured by the First and Fourteenth Amendments to the United States Constitution. The second claim is made pursuant to the free speech provisions of the New York State Constitution. The third, also brought under § 1983, and fourth claims allege violations of the Equal Protection Clauses of the United States and New York State Constitutions, respectively. The fifth and sixth claims assert administrative violations of the New York City Charter and the Procurement Policy Board rules in connection with the allegedly unlawful suspension of Housing Works as a contractor and with the non-responsibility findings. The seventh and eighth claims are brought under state for law for fraud and unjust enrichment. And the ninth claim is brought against Hiralall for accountant malpractice.

For various reasons discussed in greater detail in subsequent sections, the City and the individual defendants have moved to dismiss the Complaints for failure to state legally sufficient claims.

## III. DISCUSSION

### A. RETALIATION FOR PROTECTED FIRST AMENDMENT ACTIVITY

Housing Works's activities and constitutional rights protecting them have been the subject of other litigation in this Court. In a recent case, the proposition that the First and Fourteenth Amendments prohibit the City and its municipal officers from abridging Housing Works's right to free speech and to petition the government for redress of its grievances was undisputed. *See Housing Works, Inc. v. Safir*, 101 F.Supp.2d 163, 167 (S.D.N.Y. 2000) (although government may impose reasonable time, place and manner restrictions on speech, " '[p]laintiff's right to protest the City's lack of services for persons afflicted with AIDS and HIV is a fundamental right grounded in the First Amendment, as the parties agree.' "), *appeal dismissed*, 203 F.3d 176 (2d Cir.2000); *see also Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir.1989) ("The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances.").

Housing Works avers that the City unlawfully retaliated against it for its vigorous demonstrations and proactive litigation by, *inter alia*, (1) refusing to renew the Scattered Site and Ryan White Contracts; (2) barring Housing Works from operating as a City contractor; (3) blocking all pending contracts with Housing Works; (4) unlawfully issuing non-responsibility findings; (5) withdrawing the City's certification of Housing Works's application for State Welfare–to–Work funds; and (6) failing to certify Housing Works as an approved job training provider.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must establish that (1) the conduct complained of was

**20.** The legal basis for the first four claims in both the Giuliani and Turner Complaints are identical. The first and third claims are brought under § 1983 for violations of the First Amendment and the Equal Protection Clause, respectively. The second and fourth claims are brought under the New York State Constitution analogues to the First Amendment and the Equal Protection Clause. The only difference is that the Turner claims focus exclusively on the events surrounding the withdrawal of HRA's certification of Housing Works's application for State funds under the Welfare–to–Work Initiative. Because of the identity of the legal issues and related factual bases, the Court consolidates, for purposes of this motion, the first four claims in the Turner and Giuliani Complaints.

committed by a person acting under color of state law, and (2) the conduct at issue deprived a person of a right, privilege or immunity secured by the Constitution or laws of the United States. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 723, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 137 (2d Cir.1999), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). The contested issue here is whether Housing Works's complaint properly alleges the deprivation of a right, privilege or immunity secured by the Constitution. Housing Works claims that, as an independent contractor, it has a right to be free from retaliatory termination or non-renewal of its agreements with the City even if it vigorously exercises its right to free speech and petition. For its part, the City claims that what really happened here is that the City refused to renew certain contracts that had already expired, that it also declined to enter into new contracts with Housing Works and that neither of those actions constitute a deprivation of a legally protected right secured by the Constitution.

Both parties cite extensively to *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), in support of their positions.[21] The context of the Supreme Court's ruling in *Umbehr* is essential to understanding the full import of that decision to this case.

*Umbehr* was the first case in which the Supreme Court addressed the issue of whether, and to what extent, the First Amendment limits the ability of a federal, state, or local government in terminating their contractual relationships with independent contractors because of the latter's exercise of their right to free speech. 518

U.S. at 673–74, 116 S.Ct. 2342. Two related lines of cases, however, informed the Court's decision in *Umbehr*. First, the Court had addressed on numerous occasions the limits of a governmental entity's right to take adverse action against its *employees* for exercising their right to free speech. The basic proposition in the line of cases dealing with government employees, whether federal or state, is that public employment amounts to a valuable financial benefit which when threatened with loss may be used to chill valuable speech on matters of public concern by those employees. *See Umbehr*, 518 U.S. at 674, 116 S.Ct. 2342; *Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

A sharp line of distinction, however, should be drawn between the actions of the state as sovereign vis-a-vis the public and the actions of the state as an employer. Unquestionably, the public at large receives the full protection of the First Amendment against restrictions on speech. As the Supreme Court noted, however, "though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same things." *Waters*, 511 U.S. at 672, 114 S.Ct. 1878. Therefore, the government employee cases recognize the need to balance the employee's interests in commenting on matters of public concern against the interests of government employers in promoting the efficiency of public services. *See Pickering v. Board of Education of Township High School Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

---

**21.** *See also O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (companion case to *Umbehr*).

Employing the *Pickering* balancing test on a case-by-case basis, the Supreme Court has recognized a number of restrictions on a government employer's ability to restrict its employees' First Amendment rights. The Court has held that government employees are protected from termination for publicly or privately criticizing their employers,[22] for supporting or associating with a particular political party, unless there is a legitimate reason for requiring political affiliation,[23] and for refusing to take an oath regarding their political beliefs.[24] The protection for government employees was expanded further in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 79, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), where the Court held that promotions, transfers, and the *hiring* of new applicants based on political affiliation violates the employee's or applicant's First Amendment rights, in the absence of a vital government interest.

Second, the Court's decision in *Umbehr* relied in part on the doctrine of unconstitutional conditions, which holds that the government is not free to deny a benefit to anyone on a basis that infringes the constitutionally protected right to free speech, even when that person has no entitlement to that benefit. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The unconstitutional conditions doctrine is not limited to government employees, but extends to cover persons with a much more attenuated relationship with the government. *See Umbehr*, 518 U.S. at 680, 116 S.Ct. 2342.

Against this backdrop, plaintiff in *Umbehr* filed a claim under § 1983 alleging that the County Board had refused to re-

new his trash hauling contract because of his vigorous criticism of the three-member Board. *See id.* at 670, 116 S.Ct. 2342. The Supreme Court, after reciting the development of the principles enunciated in the line of cases above, found that, for purposes of the First Amendment right at issue, there was no legally relevant distinction between government employees and independent contractors. *Id.* at 684, 116 S.Ct. 2342 ("In sum, neither the Board nor Umbehr have persuaded us that there is a 'difference of constitutional magnitude,' ... between independent contractors and employees in this context. Independent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically—though not always—somewhat less strong in the independent contractor case.") (citations omitted). Furthermore, the Court identified possible risks in finding such a distinction: "Determining constitutional claims on the basis of such formal distinctions, which can be manipulated largely at the will of the government agencies concerned ... is an enterprise that we have consistently eschewed." *Id.* at 679, 116 S.Ct. 2342 (citations omitted).

The Court held, therefore, that the County Board could not restrict the plaintiff's right to free speech by terminating his contract and that the *Pickering* balancing test would safeguard a municipality's ability to terminate contractors for legitimate reasons. To prevail on a claim under § 1983, the plaintiff was required to show that the termination was motivated by his speech on a matter of public concern,

---

**22.** *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**23.** *See Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**24.** *See Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

which requires more than the mere fact that he exercised his right to free speech before the termination. *Id.* at 685, 116 S.Ct. 2342. Upon such a showing, the County would have a valid defense if it could demonstrate that the termination would have occurred regardless of the speech in question or if it made a persuasive case that the County's legitimate interests outweigh the free speech rights at stake. *Id.* Notably, the Court made an express qualification which, in the case at bar, goes to the heart of the parties' dispute with respect to the matters at issue: "Finally, we emphasize the limited nature of our decision today. Because Umbehr's suit concerns the termination of a *pre-existing commercial relationship* with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Id.* (emphasis supplied).

In the present dispute, the City has honed in on this final qualification to support its argument that Housing Works has no constitutionally recognized right to free speech in this case because it was seeking a renewal of certain contracts—such as the Scattered Site and Ryan White Contracts—that had previously expired, or it endeavored to enter into new contractual arrangements. Under either theory, the City posits, Housing Works falls squarely into the "bidders or applicants for new contracts" category about which the Court expressly reserved judgment in *Umbehr.*

The City further attempts to marshal support from a post-*Umbehr* case where the Third Circuit found no constitutional violation for a governmental entity's refusal to retain or engage independent contractors bidding on new contracts. In *McClintock v. Eichelberger,* 169 F.3d 812, 813 (3d Cir.1999), plaintiff was an advertising and marketing firm that over a twelve-

year period had two finite contracts to perform discrete projects for a multi-county planning commission. In addition to the two projects, the plaintiff acted as vendor for a three-year period marketing various promotional items such as magnets, vinyl banners and bags to the governmental entity. *See id.* at 814. Subsequently, plaintiff bid on a new advertising campaign scheduled to begin in 1997. *See id.* Prior to submitting its bid, plaintiff had supported and performed services for certain political candidates. One particular commission member had opposed these candidates, and plaintiff lost the contract to a third party.

In affirming the district court's dismissal of the § 1983 claim, the court found that plaintiff did not have a pre-existing commercial relationship with the commission and was merely making a new application, thus taking plaintiff out of the context of *Umbehr* and placing it within the zone of uncertainty created by the Supreme Court's reservation. In the present case, the City relies on *McClintock* in endeavoring to show that Housing Works also falls outside the ambit of *Umbehr,* thus negating the claim of a constitutional violation.

■ This Court rejects the City's position for two reasons. First, in concluding that Housing Works was merely a new applicant or a former contractor seeking to revive a terminated agreement, the City oversimplifies the factual allegations Housing Works recites in the Complaints. In fact, the Court finds more critical differences than similarities between Housing Works and the plaintiff in *McClintock.* First, Housing Works cannot be relegated to a category of independent contractors with whom the City had sporadic, discrete projects. Rather, as alleged in the Complaints, Housing Works and the City were involved in a longstanding, continuous relationship characterized by mutual, pro-

grammatic dependence and support pursuant to the Scattered Site and Ryan White Contracts. That relationship had remained active and uninterrupted for several years right up to the time covered by the events here in question. Under their contractual arrangement, the City would send a constant stream of referrals to Housing Works, which would place clients in one of its 200 hundred residential units and provide basic support services. Housing Works was required at all times to keep lines of communication open with City officials, who requested the proper forms, status reports and proof of services provided on a regular basis. At a minimum, the type of relationship alleged here is continual and ongoing as opposed to sporadic and discretely limited. Housing Works also claims that it continued to provide housing and support services, and presumably continues to provide at least some of those services today, notwithstanding the clear statement of the City's refusal to renew the contracts as set forth in the HRA press release of October 22, 1997.

In this sense, Housing Works appears altogether different from the plaintiff in *McClintock* and much closer to the plaintiff in *Ervin and Associates, Inc. v. Dunlap,* 33 F.Supp.2d 1, 7 (D.D.C.1997). After having enjoyed a five-year contractual relationship with the Department of Housing and Urban Development (hereinafter "HUD") providing a range of financial advisory services, plaintiff began to lose bids as a result of his vocal criticism of HUD's privatization initiative. The court found that "Ervin's preexisting relationship with HUD is sufficient to place him within *Umbehr's* ambit .... Ervin had a relationship with HUD that began in 1989 and, to the extent that he is still performing on any previously awarded contracts, continues today." *Id.*

The City is correct, to an extent, in framing the relevant issue as a legal one that this Court is authorized to rule upon in the context of the present motion, namely, does Housing Works have a constitutional protection against termination or non-renewal of its contracts in the context of the facts alleged? As to the Scattered Site, Ryan White Enhancement and DOH Intake Contracts, the Court finds, as a matter of law, that the Complaints sufficiently allege a pre-existing contractual relationship between Housing Works and the City longstanding and continuous enough to place this case within the purview of *Umbehr* and its logical implications.

But, insofar as a full resolution of all of Housing Works's allegations will require the trier of fact to weigh a number factual considerations after hearing all of the evidence, the City's argument again unduly simplifies this analysis. *See McClintock,* 169 F.3d at 817–18 (Roth, J., dissenting) ("The first assumption critical to the outcome reached by the majority is its *factual* determination that McClintock and Cherryhill did not have a 'pre-existing commercial relationship' with Southern Alleghenies.") (emphasis supplied). For instance, Housing Works has sufficiently alleged that the MHRA Ryan White Contract and the operating agreements relating to the two residential buildings were duly executed and that Housing Works began to perform under the agreements. Given the scope of the parties' contractual arrangements in the past, one plausible interpretation of this assertion is that the MHRA Ryan White Contract was an extension of an ongoing commercial relationship, bringing that agreement within the ambit of *Umbehr* as well. Alternatively, a factfinder might deem it necessary to ask whether the MHRA Ryan White Contract and the operating agreements were perfected, when they entered into force and whether they were effectively terminated on the

basis of protected First Amendment activity. Although the Court can resolve some of the clearly focused legal issues that the City's motion raises, it cannot pass judgment on a host of others that are more properly matters of fact. It is not within the proper province of the Court, in considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(c), to override the role of the trier of fact shortly after the close of pleadings. On the basis of the facts alleged, Housing Works is entitled to an opportunity to show that it was a pre-existing contractor whose agreements with the City were not renewed or effectively terminated because of the organization's robust First Amendment activity. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683.

Second, the Court is inclined to reject the City's position because this case raises an important issue of first impression that has not been addressed in this Circuit. In qualifying its holding in *Umbehr,* the Supreme Court neither supported nor rejected the notion of a First Amendment right of independent contractors without a pre-existing relationship with the government to be free from unconstitutional denials of their applications. It is an open question whether this controversy presents a set of facts compelling the recognition of such a constitutional right.

Because the Court holds that Housing Works has alleged facts sufficient to bring it within the rule enunciated in *Umbehr,* the Court reserves judgment on the question of whether Housing Works would have those same rights absent the finding of a pre-existing commercial relationship. In passing, however, the Court notes that although some courts have expressly declined to address this issue in the absence of further guidance, their abstention is not unanimous. *See McClintock,* 169 F.3d at 818 (Roth, J., dissenting) ("I find that the Supreme Court's First Amendment jurisprudence does not support the kind of status-based limitation on individuals' rights of political expression and association that the majority's decision endorses.").

Most notably, in a recent decision by the United States Court of Appeals for the Sixth Circuit, the court rejected the notion that only independent contractors with pre-existing relationships are entitled to First Amendment protections in the awarding of new contracts. *Lucas v. Monroe County,* 203 F.3d 964, 972–75 (6th Cir.2000). Plaintiffs in *Lucas* consisted of a company that had already been providing towing services as a listed provider on the Sheriff Department's rotation list and a towing company that had applied for inclusion on that list. *Id.* at 967–68. On summary judgment, the district court dismissed the applicant's First Amendment claim primarily on the grounds advanced by the City here—that the applicant was not an independent contractor that had a pre-existing relationship with the municipality. *Id.* at 972. The Sixth Circuit reversed the dismissal of the new applicant's First Amendment claim, invoking, in part, the principles of the unconstitutional conditions doctrine as articulated in *Sindermann. Id.* at 972–75.

As the Supreme Court's analysis in *Umbehr* shows, the present controversy sits at the confluence of three separate, but closely related strands of constitutional jurisprudence: the First Amendment rights of government employees, the doctrine of unconstitutional conditions and the principle of freedom of speech as extended to certain government contractors by *Umbehr* itself and its progeny. Although the intersection of these rulings should provide this Court with a wealth of precedent to guide its decision, neither the Supreme Court nor the Second Circuit has addressed the precise legal issue as framed

by this controversy. In order to preserve the spirit of each of these strands, however, courts should take pains to avoid inconsistent results. Were the City's position validated, an independent contractor with a pre-existing, longstanding and continuous business relationship seeking a new or renewed municipal contract and a prospective government employee applying for a non-policy-making position, both engaging in the exact same speech or expressive conduct, might well find that the latter is protected from retaliation in her application while the former will suffer the risk of losing the contract. In addition to the facial inconsistency, the result seems less defensible in light of one of the Supreme Court's stated grounds for its decision in *Umbehr*, that there is no difference of constitutional magnitude between independent contractors and government employees in the context of First Amendment protections. Such a result would also seem to violate the spirit of *Sindermann, Rutan* and *Umbehr*.

■ For these reasons, the City's motion to dismiss Housing Works's first and second claims in the Giuliani Complaint is denied.[25] With respect to the Scattered Site, Ryan White and DOH Intake Contracts, Housing Works has adequately pleaded facts giving rise to an inference that the City terminated or refused to renew pre-existing contracts on the basis of Housing Works's protected First Amendment activity. Housing Works has

also sufficiently alleged facts with respect to the MHRA Ryan White Contract and the operating agreements for the two residences to defeat a Rule 12(c) challenge at this stage in the litigation.

The Court agrees with the City's contention, however, that a claim alleging a violation of Housing Works's First Amendment rights may not be predicated on the City's actions with respect to Housing Works's Welfare–to–Work application. The allegations surrounding that application show that the City's involvement was limited to the certification aspect of a bidding process that was controlled by State agencies. In that regard, HRA was asked to approve or deny a certification that was only one part of the process. Furthermore, the City was not the ultimate decisionmaker. In the Welfare–to–Work initiative, the relevant New York State agencies were responsible for awarding contracts. Under these facts, one cannot properly conclude that the City terminated or refused to renew a contract. Nevertheless, the Court notes that evidence of the City's conduct in the Welfare–to–Work application may be probative of retaliatory intent.

## B. *EQUAL PROTECTION*

■ The City also moves to dismiss the third and fourth claims based on the Equal Protection provisions of the United States and New York State Constitutions, respectively. In essence, the City advances two

---

**25.** Free speech claims under the First Amendment and the New York State Constitution are subject to the same standards and the Court's analysis applies to both of Housing Works's free speech claims. *See Pico v. Board of Education*, 474 F.Supp. 387, 394 (E.D.N.Y.1979) ("The Claims to freedom of speech and academic freedom under the New York State Constitution are governed by the same principles that apply under the first amendment to the federal constitution."), *rev'd on other grounds*, 638 F.2d 404 (1980), *cert. granted*, 454 U.S. 891, 102 S.Ct. 385, 70 L.Ed.2d 205 (1981), *aff'd*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982); *see also East Meadow Community Concerts Association v. Board of Education of Union Free School Dist. No. 3*, 18 N.Y.2d 129, 272 N.Y.S.2d 341, 219 N.E.2d 172, 174 (1966) (analyzing the alleged constitutional harm under the same standards and noting that "[t]he expression of controversial and unpopular views, it is hardly necessary to observe, is precisely what is protected by both the Federal and State Constitutions.").

rationales in support of its motion. First, with respect to the principal allegations of contract termination, or refusal to renew, in the Giuliani Complaint, the City contends that Housing Works has failed to show that the alleged selective treatment was based on an impermissible consideration such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. (*See* Defendant's Memorandum in Support of Motion to Dismiss Giuliani Complaint, dated July 24, 2000 (hereinafter "Defendants' Memorandum"), at 7). Reasserting its contention that Housing Works has failed to show that the City's actions triggered a violation of Housing Works's First Amendment rights, the City opines that the Equal Protection claim also fails. Second, in connection with the allegations in the Welfare–to–Work RFP, the City avers that Housing Works cannot show that it was similarly situated with other applicants, thus negating unequal treatment. As the Court reads Housing Works's Complaints, these rationales contain misstatements of law and fact.

With respect to the City's first argument, the legal requirement that it purports to impose on Housing Works is inapplicable. The language and the case cited by the City concern the elements of an equal protection claim based on selective enforcement.[26] *See LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994). Housing Works has not alleged, however, a claim of equal protection based on selective enforcement. Its claim is based on the simple proposition, affirmed by equal protection jurisprudence, that it was subject to arbitrary and irrational discrimination as compared to other persons similarly situated. Housing Works may prevail on its equal protection claim if it can show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

Thus, under the standards set forth in *Olech,* Housing Works has met its burden at the pleading stage by alleging that many other non-profit public service organizations had financial management problems and that Housing Works was singled out for differential treatment with no rational basis, in this case on the unacceptable grounds of its exercise of First Amendment rights. These allegations also defeat the City's second argument, that Housing Works could not show unequal treatment. If Housing Works substantiates its claim that other non-profit corporations suffered from similar financial problems, but never received arbitrary or vindictive treatment, then Housing Works will have taken the necessary steps toward establishing differential treatment.

The Court notes that although Housing Works could not sustain a claim for a violation of its First Amendment rights in the context of its Welfare–to–Work application, Housing Works's equal protection claim is not limited in the same way. All that is required here is a showing that Housing Works, as compared to others similarly situated, was treated differently

---

**26.** In *LaTrieste,* the Second Circuit noted that "selective enforcement is a 'murky corner of equal protection law in which there are surprisingly few cases.'" 40 F.3d at 590 (citations omitted). The court found that an equal protection violation for selective enforcement would arise if: (1) plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Id.*

and that there was no rational basis for the difference in treatment. *See id.* All of Housing Works's factual allegations of vindictive treatment are premised on the City's retaliation for Housing Works's criticism of the Giuliani Administration. Therefore, any of the events alleged in the Complaints, including Housing Works's Welfare–to–Work application, may serve as the factual basis for an Equal Protection violation, assuming that Housing Works establishes the elements required by *Olech.*

For these reasons, the City's motion to dismiss the third and fourth claims of the Complaints is denied.

## C. *QUALIFIED IMMUNITY, DIRECT PARTICIPATION AND THE APPLICABILITY OF THE STATUTE OF LIMITATIONS AS TO REITER*

### 1. *Qualified Immunity*

The City also moves to dismiss the Complaints as to all of the individual defendants on the basis of qualified immunity. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The defense of qualified immunity exists "to protect the State and its officials from over-enforcement of federal rights." *Johnson v. Fankell,* 520 U.S. 911, 919, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997). Qualified immunity also guards against the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In essence, the individual defendants argue that because there is no recognized First Amendment violation for non-renewal of an expired contract or refusal to enter into a new one with an independent contractor, the officials believed that their conduct was objectively reasonable. The Court is not persuaded that the individual defendants have advanced a compelling argument for qualified immunity.

■ To assess claims of qualified immunity pursuant to *Harlow,* the Second Circuit has established a three-step inquiry. A government official sued in his individual capacity is entitled to qualified immunity: (1) when the conduct complained of is not prohibited by federal law; (2) when such conduct is prohibited, if the plaintiff's right to be free from such conduct was not clearly established at the time of the conduct; or (3) if the defendant's action was objectively and legally reasonable in light of the legal rules clearly established at the time it was taken. *See X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 65–66 (2d Cir.1999) (citations and quotations omitted). As the Circuit Court in *X–Men* noted, "[t]hese three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and third." *Id.* at 66.

The individual defendants cannot rely on any of the grounds set forth in the *X–Men* test. The Supreme Court's decision in *Umbehr* was issued on June 28, 1996, a year before the critical events alleged to have occurred in 1997–98. More importantly, the individual defendants' argument hinges on their unduly narrow interpretation, rejected above, of the factual allegations in this action. By characterizing this case as one involving new contracts or renewals of expired contracts, the City hopes to take the matter beyond the pro-

scriptions of *Umbehr* and into the arena of permissible official conduct, conferring qualified immunity on the individual defendants. But, as discussed above, Housing Works has alleged sufficient facts to show the existence of at least three pre-existing contractual arrangements that may have been unjustifiably terminated. Therefore, in this Court's view, *Umbehr* controlled the actual facts of this case at the times the underlying events occurred, and the individual defendants cannot claim qualified immunity for conduct that was objectively known to violate federal law.

■ These same arguments are reiterated in the City's contention that the right claimed by Housing Works was not clearly established at the time the actions were taken. This position also depends on whether this Court chooses to adopt the City's version of the facts. Because the Court has rejected that view, the argument also must fail. There is no question that the principles of *Umbehr* were put into play by the individual defendants' actions, occurring at least one year after that decision was released. Furthermore, the Court concurs with Housing Works that there is nothing unclear about the importance of First Amendment activity. Any municipal entity or official who expresses displeasure about any person's exercise of free speech rights and then manifestly subjects that person to adverse action must know that the First Amendment will be implicated. More than seven years ago, the Supreme Court expressed a warning precisely on point when it stated that "these cases establish a basic First Amendment principle: Government action based on protected speech may under some circumstances violate the First Amendment even if the government actor honestly believes the speech is unprotected." *Waters,* 511 U.S. at 669, 114 S.Ct. 1878. A few moments of reflection would

have led the individual defendants to the admonition in *Waters* and the rule set forth in *Umbehr.*

For all of these reasons, the Court also finds that, as a matter of law, it was not objectively reasonable for the individual defendants to believe that their actions were permissible under the First Amendment.

In their motion to dismiss the Turner Complaint, Turner and Hoover raise additional grounds for qualified immunity. They contend that because they genuinely believed that Housing Works's past financial mismanagement was grounds to withdraw or deny certification of its Welfare-to–Work application, they should be entitled to qualified immunity. Rather than substantiating a legal claim to qualified immunity, this assertion merely raises a number of related factual issues. Qualified immunity does not turn exclusively on the reasonableness of the defendants' perceptions about the plaintiff's activities. The reasonableness of the defendants' conduct in light of legal rules in existence at the time defendants' action was taken should also be considered. Whether Housing Works's past financial problems deserve the weight that defendants seek to give them and whether that justification was merely a pretext for retaliation are not issues that are proper or ripe for decision on the present motion.

Therefore, the Court concludes that the individual defendants cannot rely on the doctrine of qualified immunity to defend the charges of constitutional violations brought by Housing Works.

### 2. *Direct Participation*

■ Giuliani, Netburn, Turner and Hoover also move to dismiss the first four claims against them based on the grounds that Housing Works has failed to plead sufficiently their direct participation in the

alleged constitutional violations. In a § 1983 claim against municipal employees, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *see also Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 138 (2d Cir.1999) (to sustain § 1983 claim requires proof of direct participation in the violation or failure to remedy the violation after learning of it through a report or an appeal). Because direct participation is a question of fact, all reasonable inferences must be drawn in favor of the non-moving party on a motion to dismiss the complaint. *See Williams,* 781 F.2d at 323. Although Housing Works's factual allegations, and the reasonable inferences drawn therefrom, sufficiently aver the direct participation of Giuliani and Turner, the same cannot be said with respect to Netburn and Hoover.

### a. *Giuliani*

Giuliani asserts that the only allegation against him is that he "has not yet decided Housing Works' second-level appeals from those determinations." [27] Giuliani further contends that "[t]here is no allegation that defendant Giuliani actively participated in the alleged violations of Housing Works' constitutional rights, or that he is even aware of any violations." [28]

These statements gloss over substantial portions of the Giuliani Complaint. For instance, Housing Works explicitly alleges that Giuliani had expressed his outrage at Housing Works's free speech activities, thus raising an inference of hostile animus. Several of the individual defendants who

played critical roles in the alleged violations worked directly under Giuliani in agencies that comprised part of the Office of the Mayor. For instance, Housing Works alleges that the MOC was the agency that pulled several of its municipal contracts from the Comptroller's Office. Finally, the complaint alleges that all of the individual defendants were involved in a conspiracy to violate Housing Works's constitutional rights, which when placed against the allegations of Giuliani's alleged comments and hostile animus, raises a fair inference pointing toward Giuliani's direct involvement.

Housing Works emphasizes Giuliani's role in its pending appeals as indicative of direct participation. While it may be difficult to substantiate direct involvement solely on this basis, the apparent neglect of Housing Works's appeals, when viewed as a whole with all other allegations in the pleadings, sufficiently supports an inference of Giuliani's direct participation. *See Housing Works, Inc. v. City of New York,* 72 F.Supp.2d 402, 427–28 (S.D.N.Y.1999) ("A pointed example of the mayor's antagonism towards Housing Works is the mayor's treatment of plaintiff's appeals from HRA's finding of non-responsibility, treatment that is unusual enough to warrant an inference of retaliatory intent on the part of defendants."), *appeal dismissed,* 203 F.3d 176 (2d Cir.2000).

### b. *Turner* [29]

Turner, the Commissioner of HRA, claims that the only allegations against him are that he impeded the State from awarding the Welfare–to–Work Contract to Housing Works and that he delegated

---

**27.** Defendants' Memorandum, at 8.

**28.** *Id.*

**29.** Because the Court has dismissed Housing Works's First Amendment claim to the extent

that it relies on the Welfare–to–Work RFP, the only constitutional claims remaining against Turner are the equal protection ones. Therefore, Turner's direct participation is viewed only from that perspective.

the adjudication of Housing Works's non-responsibility appeal to the General Counsel of HRA. Turner also glosses over pertinent factual allegations.

Housing Works contends that Turner initially approved its State Welfare–to–Work application, but later retracted certification in retaliation for Housing Works's constitutionally protected activities. The purported basis for the withdrawal of certification was Housing Works's past financial troubles. When NYSDOL and NYSDOH requested a meeting to discuss alternatives, Housing Works claims that Turner summarily rejected all meaningful options, stating that HRA would refuse to endorse any plan providing State funds to Housing Works. Furthermore, Housing Works claims that Turner threatened it with withdrawal of its City JTP certification—a threat which materialized shortly thereafter. When juxtaposed with Housing Works's allegations that many other public interest organizations in its position had financial troubles, but were not subjected to this type of vindictive treatment with no rational basis, Turner's role is directly implicated in an equal protection claim.

### c. *Netburn*

The allegations and inferences of direct participation, however, cannot be sustained with respect to Netburn. He claims that the only allegations against him are that he participated in a telephone call with Keith Cylar, Co–Executive Director of Housing Works, in which he informed Cylar that certain individuals in MOC and Kaswan had prevented the registration of Housing Works's DOH Intake Contract. Housing Works contends that in that same conversation Netburn also informed it of a City "policy" not to do business with those involved in litigation with the City.

Assuming all of these allegations are true, they do not amount to an inference of direct participation in the particular acts that comprise the constitutional deprivations claimed here. The most that can be gleaned from these facts is that Netburn was a messenger. Without more substantial involvement, a claim against Netburn for constitutional violations cannot be sustained. *See Edmonson v. Coughlin*, 21 F.Supp.2d 242, 254–56 (W.D.N.Y.1998).

### d. *Hoover*

Some of the allegations surrounding the state Welfare–to–Work application are also made against Hoover, who was First Deputy Commissioner of HRA under Turner. Thus, Hoover was present at the NYSDOL/NYSDOH meeting in which Turner and Hoover rejected all alternative funding proposals. Hoover was also present when the alleged threat to rescind Housing Works's City JTP certification was made.

Apart from these allegations by association, Housing Works makes no distinct and independent assertions about Hoover's role in these events. Hoover moves to dismiss the constitutional claims against him on the grounds that direct participation has not been established and that his actions, as a matter of law, cannot constitute the proximate cause of Housing Works's injuries. The Court agrees.

First, without any additional facts specifying Hoover's own role in the Welfare–to–Work application, it is difficult to conclude that he directly participated in a meaningful way. For instance, while the sequence of events with respect to the Welfare–to–Work application begins with Turner's initial certification of Housing Works, the allegations against Hoover amount to the mere proposition that he was there when the crucial events took place, in his role as Deputy to Turner.

Second, Hoover is correct to note that in his position as Deputy Commissioner of HRA under Turner, he was not necessarily

in a position to either overrule or dictate the City's position with respect Housing Works's application. Relying on *Edmonson*, 21 F.Supp.2d at 256, Hoover argues that his actions as a Deputy cannot be the proximate cause of Housing Works's constitutional deprivation. Given the paucity of independent factual allegations as to Hoover's role and his position as subordinate to the ultimate decisionmaker(s), the Court finds that Hoover's direct participation has not been established and that Hoover's actions were not the proximate cause of Housing Works's alleged constitutional violations.

### 3. *Applicability of the Statute of Limitations to the Claims against Reiter*

Former Deputy Mayor Reiter argues that the only allegations against her are that (1) while in office she was a policymaker responsible in part for HRA, DOH and MOC; (2) sometime in 1995, she labeled Housing Works a "troublemaker" after being infuriated by the organization's activities; and (3) in January 1997, she advised Caldwell to conduct an audit of Housing Works's Scattered Site finances. Although the record is unclear, it appears undisputed that Reiter left her position with the City shortly after she recommended the audit in January 1997. On the basis of these allegations, Reiter claims that she did not directly participate in any constitutional deprivation, that her actions cannot be the proximate cause of any constitutional violation and that the applicable three-year statute of limitations bars the claims against her. The Court agrees that the statute of limitations bars the claims against Reiter.

■ In New York, the statute of limitations for § 1983 actions is three years. *Ormiston v. Nelson*, 117 F.3d 69 (2d Cir. 1997). All of the allegations of Reiter's involvement end in January 1997, while the complaint naming Reiter as a defendant was filed on May 10, 2000, after the limitation period had expired. Although Housing Works does allege that Reiter's name appeared on documents generated in September 1997 which purportedly confirm her attitude toward Housing Works, these allegations do not describe her conduct or direct participation. In addition, Reiter points out that she was not an employee of the City when these documents were allegedly created and that her actions, therefore, were not taken under "color of law," as required by § 1983. As a consequence, the statute of limitations has expired as to the claims against Reiter and those claims are dismissed.

In summary, the Court finds that reasonable inferences of direct participation may be drawn from the actions of defendants Giuliani and Turner. However, the claims against Netburn, Hoover and Reiter are dismissed because of lack of direct participation, absence of proximate cause and the expiration of the statute of limitations, respectively.[30]

### D. *CLAIMS FOR DAMAGES AGAINST THE CITY*

#### 1. *Damages against the City for Violations of the New York State Constitution*

■ The City Defendants also move to dismiss any claim for damages based upon alleged violations of the New York State Constitution—Housing Works's second

---

**30.** In the event that the Court dismisses the constitutional claims against Netburn, Housing Works has stated its intention to move to amend the complaint to amplify the allegations against him. Housing Works's request will be addressed in the Court's Order at the conclusion of this Decision.

and fourth claims for relief. The City contends that there is no statutory or common law basis for a municipality's liability for damages based on violations of the New York State Constitution.

Housing Works responds by urging the Court to extend the decision of the New York Court of Appeals in *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138–39 (1996), which held that plaintiffs stated a cause of action for damages against the State for violations of the equal protection clause and search and seizure provisions of the New York State Constitution. Housing Works also contends that nothing in the *Brown* decision limited or abrogated a private right of action against a municipality and that the reasoning in *Brown* applies equally to the present case against the City. Furthermore, it asserts that the free speech provisions of the New York State Constitution historically have provided broader guarantees than the First Amendment, thus favoring the recognition of an independent action for damages based on the New York State Constitution. Although Housing Works's points are well-taken, the Court declines to imply a new cause of action for damages against municipalities based on an extension of *Brown.*

Plaintiffs in *Brown* brought a class action against the State for its role in the investigation of a knifepoint attack on an elderly woman in the City of Oneonta. *See id.* at 1131. Having identified her attacker as an African–American male, the New York State Police conducted two sweeps in its search for the assailant: the first sweep targeted every African–American male student at the nearby State college, while the second involved haphazard interrogations of any non-white male found in and around Oneonta. *Id.* at 1131–32. The court's analysis began with the recognition that "New York has no enabling statute similar to those contained the Federal civil rights statutes permitting damage actions for the deprivation of constitutional rights," and that any recognition of a damage remedy must flow from the New York State Constitution itself. *Id.* at 1137.

Without question, the fundamental principles delineated in *Brown* have an enduring resonance. In part, the court relied on the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[31] The court's interpretation of the *Bivens* decision lends some support to Housing Works's position here:

> The underlying rationale for the [*Bivens*] decision, in simplest terms, is that constitutional guarantees are worthy of protection on their own terms without being linked to some common-law or statutory tort, and that the courts have the obligation to enforce these rights by ensuring that each individual receives an adequate remedy for violation of a constitutional duty. If the remedy is not forthcoming from the political branches of government, then the courts must provide it . . . .

*Id.* at 1138. Thus, the court found that "a cause of action to recover damages may be asserted against the State for violation of the Equal Protection and Search and Seizure Clauses of the State Constitution." *Id.* at 1138–39.

This reaffirmation of the positive nature of the State Constitution has received

---

**31.** The *Brown* court based its decision on a three-part analysis which, in addition to *Bivens,* included (1) the rationale in § 874A of the Restatement (Second) of Torts, and (2) common law antecedents of the equal protection and search and seizure provisions of the New York State Constitution. *Id.* at 1138.

strong endorsement from eminent jurists. As Justice Brennan once wrote:

> state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L.Rev. 489, 491 (1977).

There is, however, one significant distinction between plaintiffs in *Brown* and Housing Works. In *Brown*, plaintiffs' claims for damages pursuant to 42 U.S.C. § 1981 were dismissed because of the Supreme Court's earlier determination that § 1983 provides the exclusive damages remedy for a violation of rights secured by § 1981. *Brown*, 652 N.Y.S.2d 223, 674 N.E.2d at 1137; *see also Jett v. Dallas Ind. School Dist.*, 491 U.S. 701, 731, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Thus, the court in *Brown* was faced with a circumstance not present to same extent here: "claimants, who suffered similar indignities, must go remediless because the duty violated was spelled out in the State Constitution." *Brown*, 652 N.Y.S.2d 223, 674 N.E.2d at 1141. In the present controversy, the Court has sustained Housing Works's claims properly brought under § 1983 for alleged violations of the federal First Amendment and Equal Protection Clause. Housing Works is not remediless here, and the need to venture into uncharted areas of implied causes of action under the New York State Constitution is abated.

Several post-*Brown* decisions from courts in this District confirm this conclusion. In *Wahad v. Federal Bureau of Investigation*, 994 F.Supp. 237, 238 (S.D.N.Y.1998), plaintiff sought to amend his complaint to add a cause of action for damages based on an alleged violation of the due process clause of the New York State Constitution. The court denied the motion to amend, finding that "[u]nlike *Brown* where the plaintiffs had no remedy against the State, Plaintiff has stated a viable Section 1983 claim against the Municipal Defendants for the alleged due process violation." *Id.* at 240. Similarly, in *Flores v. City of Mount Vernon*, 41 F.Supp.2d 439, 447 (S.D.N.Y.1999), plaintiff's claims for damages under the search and seizure provision of the New York State Constitution were dismissed because "no private right of action exists for violations of the New York State Constitution where a Plaintiff has alternative damage remedies available, as Mrs. Flores does under her § 1983 claim." [32]

More recently, the New York Court of Appeals addressed yet another attempt to extend the scope of *Brown* to recognize a claim for damages arising from the search and seizure provisions of the New York State Constitution. *See Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001). In *Martinez*, plaintiff had been arrested, tried

---

**32.** In addition to the grounds stated in *Wahad* and *Flores*, the court in *Townes v. City of New York*, No. 94 Civ. 2647, 1998 WL 106140, *4 (S.D.N.Y. Mar. 10, 1998), *rev'd on other grounds*, 176 F.3d 138 (2d Cir.1999), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311 (1999), pointed out that even if an extension of *Brown* was warranted, plaintiffs' state law claims under the State Constitution would be barred by the applicable statute of limitations, requiring that actions against a municipality or police officer be commenced within one year and ninety days after the events alleged. The same statute of limitations would preclude Housing Works's state constitutional claims here.

and convicted for possession of narcotics, based on a search warrant that later proved to be unconstitutional. *See id.* After serving four years of her prison term, plaintiff was released and thereafter filed claims for damages against the City of Schenectady and individual police officers for violations of the search and seizure provisions of the New York State Constitution. *See id.* The Court of Appeals affirmed the dismissal of the claims for damages, reiterating that the " 'narrow remedy' established in *Brown* ... cannot be stretched to fit the facts before us." *Id.*

Specifically, the court found that the remedy in *Brown* addressed two interests: the private interests of plaintiffs harmed by the constitutional violations and the public interests in deterring future violations. The Court found that both of these objectives were met by an alternative remedy already realized by plaintiff—her release from prison. Because plaintiff was not remediless, she could not assert a cognizable constitutional tort claim. Given the New York Court of Appeals' unequivocal reluctance to extend *Brown* under the circumstances in *Martinez*, it would be a further stretch to recognize a claim for damages against the City here, where a damages remedy is readily available in § 1983 for purported violations of the United States Constitution.

Finally, endorsing the view espoused by Housing Works on this issue would require the Court to divest other competent sovereign branches of their statutorily and constitutionally protected areas of authority. First, New York courts are the arbiters of New York law, and to the extent that the Court of Appeals saw fit to imply a right of action for damages against the State for violations of the New York Constitution, the decision on whether or not to further extend *Brown* to recognize a right of damages against the City rests with that court. It is one thing for New York's Court of Appeals to read the State Constitution as giving rise to a State law cause of action. It is quite another, bordering on presumption, for a federal court to pick up at the point where the State's highest court deliberately paused and to extend a principle of State constitutional law not explicitly articulated or even considered by the State court.

Second, the critics of the majority's opinion in *Brown* have taken strong issue with the decision in part because it is claimed to represent an exercise of an extra-judicial function. *Brown,* 652 N.Y.S.2d 223, 674 N.E.2d at 1147 (Bellacosa, J., dissenting) ("Moreover, [the majority's] approach ignores the well-established discipline that subject matter jurisdiction, groundbreaking new remedies and their policy and practical ramifications, are matters appropriately within the legislative purview and, thus, not within some generalized supervisory or inferential adjudicative role of the courts.") (citations omitted). This Court is not prepared to imply new rights by further extension of *Brown* in the absence of clear indications of the State Legislature or the State's highest court on matters pertaining to the State Constitution.

For these reasons, the City's motion to dismiss all claims seeking damages for alleged violations of the New York State Constitution is granted. However, to the extent that the claims premised on the New York State Constitution form the basis for relief other than damages, those claims survive.[33]

---

**33.** For instance, Housing Works seeks both declaratory and injunctive relief which are

not precluded or even addressed by *Brown.* If violations of the State Constitution are es-

### 2. *Punitive Damages against the City and the Individual Defendants*

■ The City and the individual defendants also move to dismiss all claims for punitive damages against them. As to the City, the Court agrees that punitive damages are barred. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Punitive damages against some of the defendants acting in their *individual* capacities, however, may be sustained at this stage in the proceedings if the allegations against them demonstrate sufficiently intentional or extreme misconduct.

In *Fact Concerts,* 453 U.S. at 271, 101 S.Ct. 2748, the Supreme Court held that a municipality is ordinarily immune from liability for punitive damages for the bad-faith actions of its officials. *See also Ciraolo v. City of New York,* 216 F.3d 236, 238 (2d Cir.), *cert. denied,* 531 U.S. 993, 121 S.Ct. 484, 148 L.Ed.2d 457 (2000);[34] *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 262 (2d Cir.), *cert. denied,* 520 U.S. 1211, 117 S.Ct. 1695, 137 L.Ed.2d 821 (1997). Therefore, any claim for punitive damages against the City is dismissed.

■ Defendants, acting in their *official* capacities, are entitled to the same immunity as the City. *Ivani,* 103 F.3d at 262. To the extent that Housing Works's claims for punitive damages are based on the official conduct of defendants, those claims for punitive damages are also dismissed. However, Housing Works has brought claims against all of the defendants in their *individual* as well as official capacities. Individual defendants may be liable for punitive damages when their conduct is intentional, motivated by evil intent, or "when it involves reckless or callous indifference to federally protected rights of others." *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *McCardle v. Haddad,* 131 F.3d 43, 52 (2d Cir.1997).

The Court finds that, at this stage in the litigation, Housing Works has alleged facts sufficient to support intentional conduct, exhibiting reckless or callous indifference to Housing Works's constitutional rights. The allegations, if substantiated, would show that defendants acted with vindictive and retaliatory motives because of Housing Works's vigorous First Amendment activities. Therefore, while punitive damages are not available from the City, the individual defendants may be liable for punitive damages to the extent that Housing Works can establish that their conduct surpassed the threshold set forth in *Smith* and *McCardle.*

### E. *FRAUD AND MISREPRESENTATION*

■ The City also moves to dismiss the seventh claim alleging fraud and misrepresentation. To establish a claim of fraud, plaintiff must show (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing plaintiff to rely upon it; (3) justifiable reliance of plaintiff on the misrepresentation or material omission; and (4)

---

tablished, those claims may serve as the basis for declaratory or injunctive relief to the extent not already provided under Housing Works's federal claims.

**34.** In *Ciraolo,* plaintiff argued that her case fell into a limited exception to the general rule that punitive damages were not available from a municipality, i.e., that municipalities may be liable for punitive damages where " 'the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights.' " *Id.* This argument was rejected by the Second Circuit, and the Court finds it similarly inapplicable here.

injury proximately caused by the defendant's conduct. *See Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (1996). The City moves to dismiss on the grounds that: (1) statements, promissory in nature, relating to future actions are not actionable as fraud; and (2) Housing Works's could not have reasonably relied on statements made by those who did not have the authority to effectuate its contracts with the City. The Court agrees and Housing Works's seventh claim alleging fraud and misrepresentation is dismissed.

■ It is well-settled that allegations of mere promissory statements of future performance are not actionable for fraud. *See Wilmoth v. Sandor,* 259 A.D.2d 252, 686 N.Y.S.2d 388, 391 (1st Dep't 1999) ("No cause of action for fraud arises from allegations of a lack of intent to perform under a proposed contract ... nor from expressions of hope for the future performance of entities subject to defendants' control.") (citations and quotations omitted); *Haythe & Curley v. Harkins,* 214 A.D.2d 361, 625 N.Y.S.2d 154, 156 (1st Dep't 1995) ("Nor are allegations claiming only unfulfilled promissory expectations as to future performance actionable.") (citations omitted); *P. Chimento Co., Inc. v. Banco Popular de Puerto Rico,* 208 A.D.2d 385, 617 N.Y.S.2d 157, 158 (1st Dep't 1994) ("'[F]raud cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct.'") (citations and quotations omitted).

■ Housing Works's allegations of fraud are based entirely on statements, promissory in nature, expressing the hope that the City would act favorably on the renewal of the Contracts at issue. According to Housing Works, "defendants

Barrios–Paoli, Caldwell, Bonamarte and Dereszewski made numerous knowing and material false statements of fact and misrepresentations to Housing Works to the effect that the City *would extend* the Scattered Site Contract and Ryan White Enhancement Contract for an additional year." [35] The Court regards these statements as unrelated to present circumstances or conditions which could form the basis of a claim for fraud at the time the statements were made.

■ In assessing Housing Works's allegations in connection with the third element of a fraud claim—justifiable reliance—the Court turns to the applicable law on municipal contracts. In general, municipalities acting in their corporate capacities are held accountable for their contractual obligations in the same manner as private persons, with some legally significant qualifications. *Genesco Entertainment v. Koch,* 593 F.Supp. 743, 747–48 (S.D.N.Y.1984). The qualification of central importance here is that a municipality's authority to contract is statutorily restricted. *See id.* at 748. These limitations are not mere inconveniences or technicalities, rather they exist to protect the public at large. *See id.* at 748–49. As the court noted in *Genesco,*

> The power to approve or disapprove a municipal contract entails the power to dispose of public assets. Restrictions as to which city officials may invoke that power are not a mere formality, but are fundamental to "responsible municipal government." Without such restrictions any city official, no matter his position, could dispose of public assets.

*Id.* at 749.

Plaintiffs in *Genesco* argued that they reasonably relied on the representations of deputy officials of the New York City De-

---

**35.** Giuliani Complaint, at ¶ 277 (emphasis supplied).

partment of Parks and Recreation that they would be entitled to lease Shea Stadium for a concert. *See id.* at 745, 748. The court noted, however, that approval of the alleged contract at issue rested squarely with the Commissioner of the Parks and Recreation Department, who had not issued such an approval. *See id.* at 748. The court dismissed plaintiffs' breach of contract claim as well as their assertions of reasonable reliance, finding that "New York law places the burden of determining the scope of a municipal officer's authority upon those who deal with municipal government." *Id.* at 749. The court further noted that the City cannot be liable under an implied contract which is invalid because of failure to comply with statutory requirements. *See id.* at 750 (citing *Seif v. City of Long Beach,* 286 N.Y. 382, 36 N.E.2d 630, 632 (1941)); *see also Henry Modell & Co., Inc. v. City of New York,* 159 A.D.2d 354, 552 N.Y.S.2d 632, 634 (1st Dep't 1990), *appeal dismissed,* 76 N.Y.2d 845, 560 N.Y.S.2d 129, 559 N.E.2d 1288 (1990). The parallels to Housing Works's arguments are obvious: Housing Works also seeks to rely on the statements of various municipal officials who did not have the ultimate authority to approve the contracts at issue because their approval was not final and the agreements were not valid until the contracts were registered by the Comptroller's Office.

The Court of Appeals decision in *Garrison Protective Services, Inc. v. Office of the Comptroller,* 92 N.Y.2d 732, 685 N.Y.S.2d 921, 708 N.E.2d 994 (1999) is also instructive here. In *Garrison,* plaintiffs had provided security services to the City Department of Environmental Protection (hereinafter "DEP") under a contract that expired in August 1992. *See id.* at 995. DEP exercised its unilateral right to extend the agreement once through October

26, 1992. *See id.* As the October expiration date approached, DEP again exercised its right to extend, and the parties agreed to continue the agreement through May 23, 1993. *See id.* Plaintiff executed a change order to effectuate this second extension, which was approved by DEP in March 1993. *See id.*

Thereafter, the Comptroller's Office determined that the second contract had not been properly registered. DEP resubmitted the form twice (once in June 1993 and again on July 12, 1993) in an attempt validate the extension. *See id.* at 995–96. While DEP was resubmitting forms in compliance with the registration, DOI had initiated an investigation into alleged fraud by Garrison with regard to several other contracts with the City. *See id.* at 996.

Although plaintiff continued to provide security services to DEP, paralleling Housing Works's allegations here, the court held that the "Comptroller is under no duty to automatically register all contracts which the City and its agencies present. Indeed, section 328(c) of the New York City Charter specifically provides that the Comptroller may object to registration where there is 'reason to believe that there is possible corruption in the letting of the contract or that the proposed contractor is involved in corrupt activity.' " *Id.* The discretionary authority of the Comptroller is the same provision upon which the City relies here. Given the Comptroller's independent role in the process, a fact of which Housing Works could not have been unaware, the Court agrees that all of the representations made by the individual defendants named in this action were insufficient to have created a reasonable belief on Housing Works's part that the City would ultimately renew the contracts at issue.[36]

---

**36.** *See* Defendant's Memorandum, at 17–18.

Housing Works relies on the New York Court of Appeals's decision in *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958), to refute the City's argument that a claim of fraud may not be based on statements of future hope. Particularly, Housing Works restates the following passage, without placing it in its proper factual context: "one 'who fraudulently makes a misrepresentation of * * * intention * * * for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction' is liable for the harm caused by the other's justifiable reliance upon the misrepresentation." *Id.* at 835.

What Housing Works fails to point out is that the misrepresentation at issue in *Channel Master* was specifically determined by the court to be a misrepresentation as to present circumstances. The defendant had represented to plaintiff that it was capable of delivering a quantity of goods, a statement which was patently false at the time it was uttered because defendant had already committed its productive capacity to other customers. *See id.* at 834–35. Rather than supporting Housing Works's contention, the *Channel Master* court's analysis carefully distinguishes the misrepresentation of present fact with an unactionable future promise: "As examination of the complaint demonstrates, it contains all the necessary elements of a good cause of action, including statements of existing fact, as opposed to expressions of future expectation." *Id.* at 835. Thus, *Channel Master* cannot be used to overcome the deficiencies in Housing Works's allegations relating to the fraud claim.

Second, Housing Works's arguments with respect to justifiable reliance are slightly more persuasive, but nevertheless fail to overcome the weight of precedent.

Housing Works claims that it reasonably relied on the representations of individual defendants because non-profit corporations regularly continue to provide services while extensions are being processed and that throughout the entire time that Housing Works continued to provide services, the individual defendants continued to require status reports, proof of services provided and other documentation, all of which contributed to Housing Works's belief that the Contracts in fact would be renewed. The allegations, if true, would show that the City continued to refer clients to Housing Works, demanded that Housing Works remain in compliance with standard operating procedures and simultaneously represented that contract renewals were pending. If so, the City essentially demanded and obtained services for which it later refused to pay. While the Court does not condone the type of conduct alleged, Housing Works asks the Court, in effect, to create an exception to the general rule that all parties contracting with a municipal entity are presumed to know precisely with whom they are contracting. *See Genesco*, 593 F.Supp. at 749. That Housing Works is a not-for-profit corporation does not change the fact that the alleged misrepresentations came from individuals who were not legally authorized to bind the City to an enforceable contract extension. Moreover, Housing Works's request would also amount to bypassing the City's administrative procedure permitting equitable claims to be filed with and adjudicated by the Comptroller's Office, subject to judicial review pursuant to Article 78 of the State's Civil Practice Law and Rules ("CPLR") to obtain any appropriate relief under these circumstances.

Because Housing Works impermissibly relies on mere statements and hopes of future performance and because it has failed to establish justifiable reliance,

Housing Works's seventh claim for relief alleging fraud and misrepresentation is dismissed.

## F. UNJUST ENRICHMENT AND QUANTUM MERUIT

■ The City also moves to dismiss Housing Works's eighth claim alleging unjust enrichment and quantum meruit. As one court recently observed, "Quantum meruit is a doctrine of quasi contract ... [which] are not contracts at all, although they may give rise to obligations more akin to those stemming from contract than from tort. The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy." *Aniero Concrete Co., Inc. v. New York City Construction Authority*, No. 94 Civ. 3506, 2000 WL 863208, *9 (S.D.N.Y. June 27, 2000). A party seeking to recover for unjust enrichment has the burden of proving that (1) defendant is holding property, (2) under such circumstances that in equity and good conscience defendant ought not to retain it. *Simonds v. Simonds*, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189, 194 (1978). Because it is based on a theory of implied contract, Housing Works's eighth claim for relief presents a slightly closer call than the claim for fraud.

■ Both parties advance ample authority to support their positions. The City relies primarily on a line of cases holding that the general rule is that there can be no recovery against a municipality in quantum meruit where the original contract is void as contrary to statute. *Nevins Realty Corp. v. State*, 240 A.D.2d 480, 658 N.Y.S.2d 132, 133 (2d Dep't 1997) (the alleged agreement "required an independent approval of the State Comptroller to be valid. Since that approval was not obtained, the State is not liable for the rents now alleged by claimant to be outstanding."); *Gill, Korff and Associate, Architects and Engineer, P.C. v. County of Onondaga*, 152 A.D.2d 912, 544 N.Y.S.2d 393 (4th Dep't 1989); *New York State Ass'n of Plumbing–Heating–Cooling Contractors, Inc. v. Egan*, 86 A.D.2d 100, 449 N.Y.S.2d 86, 88 (3d Dep't 1982) ("A contractor who has performed work pursuant to a noncomplying contract may be denied recovery, either under its agreement or on the basis of quantum meruit, even when the unit of government has received the benefit of performance."). Borrowing from its arguments in its motion to dismiss the fraud claim, the City claims that recovery under an unjust enrichment theory is precluded because of the noncompliance of Housing Works's contract, that is, the lack of the City Comptroller's approval.

For its part, Housing Works cites cases which concede the general rule above, but permit recovery for plaintiffs suing municipalities in very limited instances. *See, e.g., Vrooman v. Village of Middleville, Herkimer County*, 91 A.D.2d 833, 458 N.Y.S.2d 424 (4th Dep't 1982), *appeal dismissed*, 58 N.Y.2d 610, 462 N.Y.S.2d 1028, 449 N.E.2d 427 (1983). In *Vrooman*, the court held that

A plaintiff is entitled to recover from a municipality where, as here, he has entered into a contract in good faith, the municipality possesses the authority to enter into the contract, the contract is not violative of public policy and the circumstances indicate that if plaintiff is not compensated, the municipality would be unjustly enriched.

*Id.* at 426. Until this point, all of the parties are essentially correct. There is a general prohibition of unjust enrichment claims against municipalities, but narrowly circumscribed exceptions exist.

However, Housing Works fails to persuade the Court that this case presents the kind of compelling situation necessary to depart from the general rule. For in-

stance, in *Vrooman,* the court's analysis emphasized the fact that although the Village of Middleville had not appropriated the funds that plaintiff sought, the Village had requested the engineering services because the State DOH had explicitly ordered the Village to construct sewage treatment facilities and to cease the discharge of sewage into the waters of the State. *See id.* at 425. Because the Village would have been required to make the expenditure under State orders, there was no indication that the taxpayers were adversely affected by plaintiff's claim against the Village.

Similarly, *Aniero* presents a unique set of facts that are not applicable here. Plaintiff in *Aniero* was a completion contractor, that is, a contractor who joined an ongoing construction project because the original contractor had backed out in the middle of a project. Furthermore, the plaintiff's involvement was underwritten to an extent by a surety bond secured in connection with the original project. The City claimed that plaintiff could not recover under a theory of quantum meruit because its involvement was not authorized by the competitive bidding process required for such construction contracts. The court found this argument unpersuasive. Specifically, the court noted that in the first instance, the original contract had been awarded through a competitive bidding process and plaintiff was merely stepping in ostensibly to complete the work that the original contractor left behind. In theory, the court sustained the unjust enrichment claim, allowing plaintiff to proceed because "[n]othing in the record or the allegations suggests that the procurement or the performance of Aniero's services implicates the integrity of the process of awarding public construction contracts." *Aniero,* 2000 WL 863208, at *16.

Neither of these two cases applies here. Housing Works, rather than providing services at the behest of a higher State authority, was always in an arms-length relationship with the City. Furthermore, it cannot be said that Housing Works was merely stepping in mid-project to complete a contract that had already been approved and registered by another party. In short, the general rule prohibiting unjust enrichment claims against municipalities applies.

The balance of considerations also tips in favor of the City here, where defendants have correctly noted that Housing Works has a remedy in another forum. As the court held in *Garrison,* Housing Works should proceed by first filing a notice of claim with the City's Comptroller's Office, detailing its allegations of pecuniary loss. Housing Works claims to have attempted that route. To the extent that it remains unsatisfied with the Comptroller's determination, Housing Works has the option of seeking review in the State Supreme Court pursuant to CPLR Article 78. *Garrison,* 685 N.Y.S.2d 921, 708 N.E.2d at 996.

For these reasons, the City's motion to dismiss the eighth cause of action is granted.

## G. *ACCOUNTANT MALPRACTICE*

In a separate motion, Hiralall moves to dismiss Housing Works's ninth claim for relief in the Giuliani Complaint for accountant malpractice and negligence in connection with the January 1997 audit recommended by Reiter. Housing Works asserts that Hiralall owed it a duty of exercising reasonable care, skill and diligence which Hiralall breached by, *inter alia,* (1) failing to follow generally accepted accounting principles (hereinafter "GAAP"); (2) failing to follow the Single Audit Guide in conducting the audit; (3) refusing to audit records because of objections to format; (4) failing to disclose ma-

terial information concerning Hiralall's professional capabilities; and (5) wrongfully concluding that Housing Works owed approximately $1 million to the City of New York.[37] The Court agrees with Hiralall that these allegations do not state a claim of accountant malpractice and that there are no grounds to recognize a new cause of action in the manner in which Housing Works seeks.

 In general, a plaintiff alleging a claim of accountant malpractice must show (1) a departure from accepted standards of practice, and (2) that the departure was the proximate cause of injury. *See Sheehan v. City of New York*, 40 N.Y.2d 496, 387 N.Y.S.2d 92, 354 N.E.2d 832, 834 (1976); *Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 639 N.Y.S.2d 329, 335 (1st Dep't 1996). However, the general rule, as explained in the time-honored decision of *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444–45, 447 (1931), also posits that direct privity is necessary to maintain a malpractice or negligence claim against an accountant. This Court concludes that Housing Works has failed to allege a set of facts that, if proven, would establish the existence of privity here.[38] Housing Works concedes as much when it declares that the privy party was the City: "Defendant Jack Hiralall, P.C. ('Hiralall') was retained by HRA to conduct an audit of Housing Works books and records."[39] Thus, in order to survive the motion to dismiss, Housing Works must attempt to fit its ninth claim for relief into a narrowly circumscribed category of cases permitting accountant malpractice and negligence actions in the absence of direct privity.

The seminal case in this regard is *Ultramares*. In broad strokes, the facts in *Ultramares* follow a familiar pattern that repeats itself many times over in subsequent cases: plaintiff lent money to a third party in alleged reliance on the representations of an accountant who neglected to convey material facts that would have shown that the borrower was, in fact, insolvent. *See id.* at 442–43. The plaintiff in *Ultramares*, however, had no direct relationship with the defendant, and the latter merely prepared a number of copies of certified financial statements which the borrower distributed to creditors as necessary. Under the circumstances, the court dismissed plaintiff's claim for negligence. *See id.* at 450.

In so holding, the court ruled that the relevant inquiry was whether the relationship between the non-privy parties is a "bond ... so close as to approach that of privity, if not completely one with it." *Id.* at 445–46 (also referring to an "intimacy of the resulting nexus" between the parties). In evaluating whether the parties had a relationship of near privity sufficient to sustain a claim of negligence, the court found it helpful to distinguish cases where justified reliance by the plaintiff was manifest in its relationship with defendant. For instance, in *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 275–76 (1922),

---

**37.** Giuliani Complaint, at ¶ 293.

**38.** In its Memorandum of Law in Opposition to Defendant Jack Hiralall, P.C.'s Motion to Dismiss, dated Aug. 28, 2000 (hereinafter "Plaintiffs' Opposition"), at 7, Housing Works makes the creative argument that there was privity between it and Hiralall because Housing Works was the subject of the audit. Because it cannot come forward with any conclusive definition of privity support-

ing its interpretation, Housing Works cites what it believes to be analogous cases in the physician-patient context. For reasons set forth in greater detail in this section, these arguments are unpersuasive, and the Court finds no genuine issue of material fact as to the absence of privity.

**39.** *Id.* at ¶ 291.

plaintiffs, purchasers of beans, relied on the representations of defendant, a certified weigher of beans, who was retained by a non-party seller. Although the parties to the action were not in direct privity, they were inextricably linked by design: the seller expressly instructed the defendant to certify the weight of goods and furnish a copy of such certification to the purchaser. *Id.* at 275. In fact, the particular certification of weight at issue identified plaintiff-purchaser, which clearly evinced defendant's knowledge of plaintiff's reliance on the report. *Id.* From this, it was also reasonable to infer that defendant knew that plaintiff would rely on the report in order to consummate its purchase of the goods. Thus, the plaintiff in *Glanzer* presented a "case where the transmission of the certificate to another was not merely one possibility among many, but the 'end and aim of the transaction.'" *Ultramares,* 174 N.E. at 445.

Having failed to allege a relationship closely approximating the bond of privity, plaintiff's claim of negligence in *Ultramares* was dismissed. The court also expressed its concern that extending liability for negligence could have the undesirable consequence of exposing any number of professionals to potentially limitless liability:

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.

*Id.* at 444.[40]

More than fifty years later, in two separate cases, the Court of Appeals had occasion to review its decisions in *Ultramares* and *Glanzer.* In the more recent context, the problems of and intricacies in an accountant's liability for negligence are made more acute because of the "modern ubiquity of financial statements." *See Parrott v. Coopers & Lybrand, L.L.P.,* 263 A.D.2d 316, 702 N.Y.S.2d 40, 43 (1st Dep't), *aff'd,* 95 N.Y.2d 479, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000). Nevertheless, the Court of Appeals concluded that changing times did not warrant abandoning precedent: "Inasmuch as we believe that a relationship 'so close as to approach that of privity' remains valid as the predicate for imposing liability upon accountants to noncontractual parties for the negligent preparation of financial reports, we restate and elaborate upon our adherence to that standard today." *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, 115 (1985); *see also European American Bank & Trust Co. v. Strauhs & Kaye,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985) (companion case).

The elaboration in *Credit Alliance* consisted of distilling the principles of *Ultramares* and *Glanzer* and incorporating them into a three-prong test for determining an accountant's liability for negligence. The court held that

---

**40.** The court also remarked critically at the possibility of extending liability to other professionals:

> The extension, if made, will so expand the field of liability for negligent speech as to make it nearly, if not quite, coterminous with that of liability for fraud .... Liability for negligence if adjudged in this case will extend to many callings other than an audi-tor's. Lawyers who certify their opinion as to the validity of municipal or corporate bonds, with knowledge that the opinion will be brought to the notice of the public, will become liable to the investors, if they have overlooked a statute or a decision, to the same extent as if the controversy were between client and adviser.
>
> *Id.* at 447–48.

Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* at 118. The court noted that while the criteria permit some flexibility in the application of rigid privity rules, they do "not represent a departure from the principles articulated in *Ultramares* [and] *Glanzer* . . . rather, they are intended to preserve the wisdom and policy set forth therein." *Id.*

■ Subsequent cases have clarified that the three prongs of the *Credit Alliance* test, although conceptually related, are distinct requirements, and plaintiffs seeking to impose liability for accountant malpractice or negligence in the absence of privity must advance allegations sufficient to establish all three to survive a motion to dismiss. *See Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080, 1083 (1992) ("The indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed accountants 'sufficiently approaching privity' based on 'some conduct on the part of the accountants.' ")

(citations omitted); *Parrott,* 702 N.Y.S.2d at 44 ("Hence, although there is some conceptual overlap among the showings necessary to establish these requirements, the Court of Appeals has nevertheless set forth three discrete criteria. Evidentiary proof, in admissible form, must be offered in support of all three criteria in order to warrant trial.") (citations omitted). Housing Works has failed to allege facts supporting any of the three criteria of the *Credit Alliance* test. Accordingly, this Court concludes that Housing Works has not adequately pleaded a relationship with Hiralall sufficiently approaching privity.

The first prong of the *Credit Alliance* test requires Housing Works to establish that Hiralall must have been aware that the financial reports were to be used for a particular purpose or end aim. *See* 493 N.Y.S.2d 435, 483 N.E.2d at 118. The Complaints, however, lack any substantial allegations as to Hiralall's awareness of the purpose of the audits. In fact, the bulk of the factual allegations speaks only to the purported knowledge of the City as to Hiralall's qualifications, or lack thereof.[41] The reasonable inferences to be drawn from the sparse allegations do not support the type awareness required by *Credit Alliance*. The most likely scenario is that Hiralall knew as much as the City was willing to tell it: that an audit of the Scattered Site program was required to ascertain whether Housing Works actually owed money to the City. The facts, as alleged, simply do not support any more than this. If, by merely asserting a claim of accountant malpractice, Housing Works seeks to establish that Hiralall knew that the purpose of the audit was to either terminate Housing Works as a contractor

---

41. *See* Giuliani Complaint, at ¶¶ 88–93. Housing Works allegations of knowledge amount to charges that: "HRA defendants knew that an audit firm with a staff as limited as Hiralall could not competently conduct the audit of Housing Works"; "HRA defendants knew or should have known that Hiralall was not truly independent and not qualified to conduct the audit of Housing Works."

or to render it ineligible for future contracts, those allegations are not present, explicitly or implicitly, on the face of the Complaints. Therefore, Housing Works fails to establish the necessary showing of awareness on the part of Hiralall as set forth in *Credit Alliance.*

The second criterion of the *Credit Alliance* test requires Housing Works to come forward with allegations that Hiralall knew that Housing Works intended to rely on his audit. *See id.* at 118. Hiralall correctly notes that the true party in reliance here was the City: the City contracted directly with Hiralall for the purpose of obtaining an audit of Housing Works's Scattered Site program, and the City was the only party contemplating any action on the basis of the audit report. Housing Works, in contrast, was merely the subject of the audit. Hiralall also points to these facts in support of his contention that he had no knowledge that Housing Works intended to rely in some direct way on its audit report.

Housing Works's allegations of reliance on the audit report are almost non-existent. Even if the Court draws all reasonable inferences in its favor, the most that can gleaned is that Housing Works relied, in the broadest sense of term, in a passive manner, merely hoping for a favorable report that would prompt the City to continue contracting with it. The case law applying the *Credit Alliance* test requires more. A non-privy plaintiff cannot "unilaterally create such an extraordinary obligation, imposing negligence liability of a significant commercial dimension and consequences by merely interposing and announcing its reliance in this fashion." *Security Pacific,* 586 N.Y.S.2d 87, 597 N.E.2d at 1085.

The cases which sustain findings of reliance in the context of negligence claims against accountants or other professionals in the absence of privity all have a common strand: the plaintiffs' alleged reliance on the report at issue was manifested in their subsequent actions or outward conduct of which defendants were clearly aware. *See, e.g., Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 541 N.Y.S.2d 335, 539 N.E.2d 91, 95 (1989) (in a claim of negligence against engineers, plaintiff sufficiently established that through direct contacts, information transmitted and the nature of the work, defendants were aware that plaintiff would act in reliance on the reports at issue); *Glanzer,* 135 N.E. at 275–76 (plaintiffs relied on the certifications of weight in making its purchases of beans, which reliance was clearly and objectively understood by defendants); *Bernstein v. Arthur Andersen & Co.,* 210 A.D.2d 193, 621 N.Y.S.2d 80, 81 (2d Dep't 1994) (plaintiff who defendant knew was personally guaranteeing a loan in the amount of $175,000,000 sufficiently alleged reliance in accordance with *Credit Alliance* test); *Ackerman v. Price Waterhouse,* 156 Misc.2d 865, 591 N.Y.S.2d 936, 939–40 (Sup.Ct.1992) (limited partners, although not in privity with defendant accountants, nevertheless established that they relied on tax schedules and opinions prepared by defendant in connection with their annual tax returns), *aff'd,* 198 A.D.2d 1, 604 N.Y.S.2d 721 (1st Dep't 1993), *leave to appeal granted,* 200 A.D.2d 951, 608 N.Y.S.2d 69 (1st Dep't), *reversed on other grounds,* 84 N.Y.2d 535, 620 N.Y.S.2d 318, 644 N.E.2d 1009 (1994).

These objective and outward manifestations of active reliance are noticeably absent in Housing Works's allegations. Although Housing Works has established that it stood by, awaiting the final report, the pleadings are devoid of any facts tending to show that the audit report was integral to some use or transaction envisioned by Housing Works and known to

Hiralall, or that Housing Works would actively rely on the report, for instance, by incorporating it into an application for funding, using it to obtain interim financial assistance in the form of debt to continue its operations, or otherwise contemplating action based on the results of the accounting. Therefore, Housing Works also fails on the second prong of the *Credit Alliance* test.

Housing Works's allegations in connection with the third criterion are similarly insufficient. *Credit Alliance*, 493 N.Y.S.2d 435, 483 N.E.2d at 118, also requires a showing of "some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." At the outset, the Court notes that the Complaints are almost devoid of any allegations as to Hiralall's conduct linking it with Housing Works. In Plaintiff's Opposition, Housing Works attempts to cure the factual deficiencies in the Giuliani Complaint by alleging, for the first time, a number of meetings and communications that transpired between Housing Works and Hiralall.[42] Initially, the Court notes that any consideration of these allegations, not present in either the pleadings or affidavits, would be improper in the context of the present motion. *See Fort Wayne Telsat v. Entertainment and Sports Programming Network*, 753 F.Supp. 109, 113 n. 4 (S.D.N.Y.1990) ("It is a basic principle that a complaint may not be amended by the plaintiff's brief filed in opposition to a motion to dismiss."). Furthermore, it is highly doubtful that such allegations would matter in the final analysis.

Courts have uniformly required more than phone calls, general communications or unacknowledged assertions of reliance in order to establish "linking conduct."

*See, e.g., Security Pacific*, 586 N.Y.S.2d 87, 597 N.E.2d at 1085–86 (one phone call allegedly communicating plaintiff's reliance on defendant's financial statement was not "sufficient conduct ... evidencing a relationship between [plaintiff] and the accountants, which *Credit Alliance* contemplates."); *LaSalle National Bank v. Ernst & Young, LLP*, 285 A.D.2d 101, 729 N.Y.S.2d 671, 675 (1st Dep't 2001) (plaintiff's phone call and subsequent correspondence allegedly conveying reliance on certified financial statement constituted no more than "unilateral conduct by the lenders, and not affirmative conduct by Ernst & Young."); *Parrott*, 702 N.Y.S.2d at 46 ("[T]here is no indication that plaintiff ever met or even communicated with the accountants, or that the accountants were even aware that plaintiff owned company stock, or that the stock would be repurchased by the employer-client at a value fixed by accountants."). If Hiralall in fact understood that Housing Works intended to rely in a meaningful way on its report, Housing Works must come forward with more than its own unilateral perceptions of its reliance or conclusory statements about the significance of meetings between the parties; it must allege, at a minimum, conduct on the part of Hiralall evincing its awareness of Housing Works's contemplated use of the report and reliance. Because Housing Works has failed to do so, it cannot sustain its burden of pleading pursuant to the third criterion of the *Credit Alliance* test.

Although unable to allege facts sufficient to establish any of the three criteria set forth in *Credit Alliance*, Housing Works nevertheless urges this Court to abandon the near privity analysis altogether and to recognize an enlargement of professional liability based on decisions in

---

**42.** Plaintiff's Opposition, at 7.

the personal injury and physician-patient contexts. *See, e.g., Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144 (N.D.N.Y.1997). Alternatively, Housing Works argues that these purportedly analogous cases establish the existence of direct privity between it and Hiralall. After a careful review of the *Santiago* decision and of the circumstances present here, the Court is persuaded that Housing Works has not advanced sufficient grounds to justify an extension of liability for negligence in the context of municipal accounting.

At the outset, it is worth noting that the present case and *Santiago* are based on fundamentally distinct conceptual underpinnings. In *Santiago,* an employee was fired after falsely testing positive for cocaine use, in a test administered by a physician who was hired by plaintiff's employer. *See id.* at 146–47. Although there was no formal, contractual privity between plaintiff and physician, the court nevertheless held that the physician "had a duty to Santiago to collect his specimen with due care ... [and] that sufficient material factual issues exist that a trial is warranted." *Id.* at 153.

The court's decision in *Santiago,* however, was driven in part by the unique circumstances present in a physician-patient relationship. *See id.* at 152 n. 7 ("Without flushing out this issue, the court wishes to note one other possibly significant distinction between the instant case and *Hall:* here, instead of a detective agency performing the exam, we have a physician's office thus begging the question whether a doctor-patient relationship is created in these circumstances.").[43] Thus, it is difficult to apply the limited enlargement of negligence liability in the context of a physician-patient relationship to the context of accountant malpractice or negligence presented here.

The rationales in the accountants cases point toward qualified contraction rather than enlargement of negligence liability. Dating back to the Court of Appeals decision in *Ultramares,* courts have recognized a distinction in negligence theories based on some aspect of physical force or injury and those based on purely economic, or otherwise abstract, harm. As Chief Judge Cardozo noted, "[i]n either view, however, what is released or set in motion is a physical force. We are now asked to say that a like liability attaches to the circulation of a thought or a release of the explosive power resident in words." *Ultramares,* 174 N.E. at 445. The court in *Ossining* was even more emphatic about the continuing relevance of near privity in negligence cases absent this physical force: "in negligent misrepresentation cases, which produce only *economic injury,* is privity of contract required in order for plaintiff to state a cause of action? Whether defendants are accountants (as in several recent cases) or not (as here), our answer continues to be that such a cause of action requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity." *Ossining,* 541 N.Y.S.2d 335, 539 N.E.2d at 91 (emphasis supplied). The issue, then, becomes whether Housing Works has advanced sufficient grounds to depart from these unequivocal statements distinguishing physical harm from economic harm and emphasizing the indispensable require-

---

**43.** In *Hall v. United Parcel Service of America, Inc.,* 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273 (1990), the Court of Appeals refused to recognize a cause of action for negligence against a detective agency for the allegedly negligent administration of a polygraph test.

ment of establishing near privity in cases of accountant malpractice or negligence.

Housing Works's arguments are not completely without merit. It is true that Housing Works and other similarly situated non-profit organizations are at risk from negligent or reckless auditors performing services as agents of governmental entities. If accepted as true, the allegations would show that Housing Works has been precluded from contracting with the City and possibly denied State funding, on the basis of an allegedly false audit report which recklessly overstated Housing Works's liability to the City. On this basis, Housing Works may genuinely believe that its future is at stake.

There are, however, countervailing policy considerations which may outweigh Housing Works's interests in advancing a new theory of liability against municipal accountants. The importance of independent auditors to the proper functioning of local governments is difficult to overstate. Their duty as uninterested third parties is to ensure that the public's trust and the people's purse are well maintained. When they uncover any credible evidence of wrongdoing on the part of those accepting benefits from local governments, auditors must be vocal, persistent and independent. Allowing the subjects of the audits to proceed with claims against the auditors under an expanded theory of liability and in the absence of a direct contractual relationship would work to undermine the critical independence accountants need to perform their duties effectively.

Upon balancing these competing interests against the backdrop of the New York Court of Appeals doctrine enunciated in *Ultramares* and its progeny, the Court concludes that the enlargement of negligence liability here sought by Housing Works is unwarranted. Therefore, in order to allege a claim of accountant mal-

practice or negligence, Housing Works must establish the functional equivalent of privity. Having failed to plead facts sufficient to establish any of the three criteria in the *Credit Alliance* test, Housing Works's ninth claim for relief must fail, and Hiralall's motion to dismiss is granted.

Housing Works has stated its intention to move to amend the complaint to allege an additional claim or to amplify the factual allegations if the Court dismisses its ninth claim. Whether the ninth claim is couched as a general negligence, accountant malpractice, or negligent misrepresentation claim, the requirement of establishing the functional equivalent of privity remains. Because there appears to be no set of facts that could substantiate near privity between Housing Works and Hiralall in the present controversy, leave to amend the complaint as against Hiralall will be denied.

### H. *HOUSING WORKS'S FIFTH AND SIXTH CLAIMS*

Housing Works's fifth and sixth claims allege administrative violations of the New York City Charter and the Procurement Policy Board rules in connection with the non-responsibility findings and the alleged debarment of Housing Works as a City contractor. Although the City Defendants have moved to dismiss the Giuliani Complaint in its entirety, they have not addressed the fifth and sixth claims in their motion papers. Standing alone, the allegations in these claims sufficiently assert violations of the relevant municipal laws to preclude dismissal of the fifth and sixth claims.

### IV. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the City's motion to dismiss Housing Works's first and second

claims in the Giuliani Complaint (No. 00 Civ. 3561) is denied; and it is further

**ORDERED** that the City's motion to dismiss Housing Works's first and second claims in the Turner Complaint (No. 00 Civ. 1122) is granted; and it is further

**ORDERED** that the City's motion to dismiss Housing Works's third and fourth claims in the Giuliani and Turner Complaints is denied; and it is further

**ORDERED** that the City's motion to dismiss all claims for damages based on the New York State Constitution is granted; and it is further

**ORDERED** that the individual defendants' motion to dismiss on the grounds of qualified immunity is denied; and it is further

**ORDERED** that the motion of defendants Giuliani and Turner to dismiss the claims against them for lack of direct participation is denied; and it is further

**ORDERED** that the motion of defendants Netburn and Hoover to dismiss the claims against them for lack of direct participation and absence of proximate cause is granted; and it is further

**ORDERED** that the motion of defendant Reiter to dismiss the claims against her for expiration of the statute of limitations is granted; and it is further

**ORDERED** that the City's motion to dismiss the seventh and eighth claims in the Giuliani Complaint (No. 00 Civ. 3561) is granted; and it is further

**ORDERED** that Hiralall's motion to dismiss the ninth claim in the Giuliani Complaint (No. 00 Civ. 3561) is granted; and it is further

**ORDERED** that Housing Works's alternative motion to amend the complaint to support the allegations against Netburn is granted and Housing Works may file an amended complaint within thirty (30) days

of this Decision and Order for the sole purpose of amplifying the factual allegations as to defendant Netburn; and it is finally

**ORDERED** that the parties shall appear for a status conference before the Court on December 17, 2001 at 2:00 PM.

**SO ORDERED.**